## THE STATE OF CONNECTICUT *vs.* ANTONIO GILLETTO.

Third Judicial District, New Haven, January Term, 1923.
WHEELER, C. J., BEACH, CURTIS, BURPEE and KEELER, Js.

Section 3173 of the General Statutes prohibits shooting or hunting on Sunday, and provides that the possession in the open air, on that day, of any implement for hunting shall be deemed prima facie evidence of hunting in violation of the statute. *Held* that from its history, text, and constant association in the statutes with game laws, the statute must be interpreted as a game law and not a Sunday law.

In order to carry out provisions designed for the protection of game, and to prevent the evasion of the prohibition primarily and chiefly intended, it is often necessary to extend the operation of the law so as to comprehend acts with reference to other animals than those with which the prohibited acts are directly concerned.

The section in question construed, and *held* not to be restricted to the shooting or hunting of protected game.

The defendant was convicted under this statute for patrolling a brook on Sunday with a gun for the purposes for which he had been hired by the owner thereof, namely, to warn off strangers seeking to fish there, and to shoot any woodchucks or crows seen to be destroying crops. He also planned to shoot any snakes or frogs that he saw in or near the brook. *Held* that his action came within the prohibition against hunting as used in the statute.

The statute is not unconstitutional as violating the right of every citizen to bear arms in his defense, since its intention is to prohibit shooting as a form of hunting birds and quadrupeds only; nor is it at variance with provisions allowing owners of land to kill certain quadrupeds and birds when destroying crops upon their land, since such a proceeding cannot be considered hunting.

Argued January 24th—decided April 4th, 1923.

INFORMATION for "hunting" on Sunday, brought by appeal from a judgment of a justice of the peace to the Criminal Court of Common Pleas in New Haven County and tried, by election of the accused, to the court, *Booth, J.;* facts found and judgment of guilty rendered, from which the accused appealed. *No error.*

The accused was prosecuted for violation of § 3173 of the General Statutes, reading as follows: "SUNDAY HUNTING PROHIBITED. No person shall, on Sunday, shoot or hunt; and the possession in the open air, on Sunday, of any implement for hunting shall be deemed *prima facie* evidence of hunting in violation of the provisions of this section. Nothing herein shall apply to section 794."

The trial court found that the accused and his father were employed by one Hendricks, the owner of a farm in Southbury, through which ran a brook emptying into a small bay or cove, in which said Hendricks claimed exclusive fishing rights, and which he had stocked with trout; and for the protection of which it was the duty of the accused and his father to patrol and conserve the fish therein, by warning off strangers seeking to fish in the brook or cove; it was also their duty to protect the corn and other crops upon the farm, by shooting any crows or woodchucks seen to be destroying crops.

On Sunday, May 28th, 1922, the accused, with his father, was patrolling the brook for the purposes for which he had been hired by Mr. Hendricks, and had with him the gun furnished by Mr. Hendricks. It was the intention of the accused while so patrolling the brook on that day, to shoot any snakes or frogs that he saw in or near the brook, and to shoot any woodchucks or crows that he saw destroying any corn or other crops of Mr. Hendricks, thereby protecting the crops; and the accused did not have any other purpose or intention in having a gun with him on that day.

In finding the accused guilty, the court reached the following conclusions of law: 1. The carrying of a gun on Sunday by a person upon his own land, or by an employee upon the land of his employer, for the purposes of protecting the crops upon his own or his em-

ployer's land, and the trout in his own or in his employer's brook, or with the intention of shooting crows or woodchucks that were destroying his own or his employer's crops, or with the intention of shooting any snakes, frogs or vermin upon his own or upon his employer's land, was "hunting" within the meaning of § 3173 of the General Statutes, and in violation thereof. 2. That it is a violation of § 3173 for a person upon his own property on a Sunday to have with him a gun with the intention of shooting, or in shooting, said gun at any reptiles, birds, quadrupeds or vermin that are damaging or liable to damage the fish, crops, fowls or stock of the owner of the land.

Defendant, on appeal, assigns error in the above conclusions of the trial court, principally upon the grounds that in the section of the statute underlying the prosecution the force of the words "shoot or hunt" is limited to shooting or hunting game birds or quadrupeds, and has no application to a person shooting snakes, frogs, vermin, crows or woodchucks in protection of an employer's crops or property; also, that said section does not apply to a person hunting or shooting upon his own land, or to an employee hunting or shooting upon his employer's land with the authority and consent of the employer.

An incidental and preliminary question raised was whether the section was a "game law" looking to the protection of game, or a "Sunday law" to enforce proper observance of the day.

*Robert C. Stoddard,* for the appellant (the accused).

*Edwin S. Pickett,* Prosecuting Attorney, for the appellee (the State).

KEELER, J. In determining the question as to whether the provision under consideration is of the

nature of a "game law" or a "Sunday law," the original form of its enactment, its changes by amendment, and its place in several Revisions of the statutes, will throw considerable light, and also have value in the construction of the section itself.

What is now General Statutes, § 3173, and classified under the title "Fisheries and Game" and the chapter on "Birds," first made its appearance upon the statute book in the Public Acts of 1877, Chapter 116, § 7. The Act is entitled "An Act concerning the Preservation of Game," and § 7 reads as follows: "There shall be no shooting or hunting, or having in possession in the open air the implements for shooting, on the first day of the week called Sunday, and any persons violating the provisions of this section," etc. The law of 1877, of which this section forms a part, was amended in 1881 (Public Acts of 1881, p. 29), and the amendment was entitled "An Act amending the Game Laws" and designated as § 8.

In the Revision of 1888, this § 7 of the Act of 1877 appears as § 2533, changed somewhat in wording but not in purport, and appears in the title "Preservation of Game." In 1901 a complete codification of the game laws was made (Public Acts of 1901, Chap. 140), in which this section is put in Article 2, headed "Birds," and reads as follows: "No person shall on Sunday shoot or hunt or have in possession in the open air the implements for shooting." In these exact words the provision was carried into the Revision of 1902 under the title "Fisheries and Game," and the chapter headed "Birds," and as § 3132. In 1907 (Public Acts of 1907, Chap. 162) § 3132 was amended and brought to the form in which it appears in the Revision of 1918 as § 3173, with only the change of the last word from "act" to "section," and is classified as above set forth.

The original section in the Act of 1877, except for

its title, might perhaps have been classified as a Sunday law, but the title states the object of the enactment to be the preservation of game, and in all of the subsequent amendments and revisions, it is associated in classification with what is popularly called the game law. The maxim *noscitur a sociis* need not be pressed too far as bearing upon the situation, but it is a valuable aid in construction. Then again, the constant association of the provision considered with other provisions unquestionably relating to game, and to game only, taken in connection with the titles under which it has been included, are very persuasive in the absence of anything in the body of the law to demand a different construction. *Middletown* v. *New York, N. H. & H. R. Co.,* 62 Conn. 492, 496, 27 Atl. 119; *United States* v. *Fisher,* 6 U. S. (2 Cranch) 358, 386; *United States* v. *Palmer,* 16 U. S. (3 Wheat.) 610, 631; *Field* v. *Gooding,* 106 Mass. 310, 313; *People ex rel. Westchester Fire Ins. Co.* v. *Davenport,* 91 N. Y. 574, 591; *People* v. *O'Brien,* 111 N. Y. 1, 59, 18 N. E. 692; *Deddrick* v. *Wood,* 15 Pa. St. 9, 12.

It does not appear, however, that we are forced to rely upon the light thrown upon this provision by its title, nor by the provisions with which it is associated in enactment, amendment and revision. An examination of the text of the section, taken in connection with the mischief to be obviated, and the Sunday law as it existed in 1877, seem to lead to very clear inferences in construction. The Sunday law existing in 1877 is found in General Statutes, Revision of 1875, p. 521, § 57, and had long existed with substantially the same wording. Its well known prohibitions included secular business or labor, except acts of necessity or mercy, and, specifically, any sport or recreation. The provisions of this law were ample to conserve the peace and quiet of the day of rest, and there existed in that regard no

need of any further enactment specifically directed toward hunting and shooting. Shooting, of course, makes a noise which might impair the Sabbath quietude of the neighborhood, but hunting, apart from shooting, is not a practice likely to have such an effect. Any noise made in hunting adequate to conflict with the restful calm of the neighborhood, would affect disastrously the chance of securing any game in the immediate vicinity.

The words of the original statute of 1877 are "shooting and hunting"; the present Act reads "shoot or hunt." "To hunt" is the inclusive or generic term; "to shoot" a specific and subordinate one included in the wider designation of hunting. A fair interpretation of this part of the section would seem to be as if it read "hunting by shooting or otherwise." In the part of the section relating to the possession of implements, mention is made of implements of "shooting," only down to and including the Revision of 1902. In 1907 these words are changed to "implements for hunting," in which wording the section appears in the present law. It was the evident legislative intent to have the existing law exact and comprehensive, and so while the ordinary implement of hunting is a gun, the implement of shooting, still there were other accessories of hunting of value as evidence of intent.

From the considerations above recited may be deduced a professional and legislative construction of this provision as a game law, which we think is controlling in connection with the phrasing of the enactment itself. We therefore conclude that the defendant is not, in the information, charged with violating a Sunday law, nor, on the facts found by the court, is he guilty of such violation.

We pass to the principal controversy in the case as to what acts are covered by, and violative of, the law

as quoted in the statement of facts, and of which the possession by any defendant of implements of hunting is prima facie evidence. The defendant claims that he can only be held guilty, if he was in pursuit of game of the character protected by law from destruction either entirely and absolutely, or of game the killing of which is legal only during what are called open seasons, and is illegal at all other times called closed seasons, and that Sundays, by force of the enactment under consideration, are added to and made part of the closed seasons. In other words, he contends that the Act is concerned only with the hunting of protected game, and that therefore the possession on Sunday of an implement of hunting with the intent to kill birds, quadrupeds or water-dwelling animals not protected, which possession and intent is found as a fact by the court in the instant case, is not prima facie evidence of a violation of the statute; and, furthermore, that on Sunday he might lawfully kill any beast, bird or reptile not in the protected class. In other words, he claims that in this statute the word "hunt" means to hunt protected game, since it is found in a section of the Act protecting game. The court held otherwise, and construed the words hunt and shoot as having a wider significance, and to be used in its popular sense rather than with any technical meaning.

Webster's New International Dictionary defines the word "hunt" as follows: "To follow or search for (game or prey) for the purpose, and with the means, of capturing or killing it; to pursue (game or prey) for food or in sport; . . . *esp.*, to pursue with weapons of the chase, and often with the assistance of trained animals." Bouvier, Law Dictionary, defines hunting as "the act of pursuing and taking wild animals." Some definitions of "game" are as follows: Bouvier, Law Dictionary: "Birds and beasts of a wild nature, obtained by fowling

and hunting. . . . As applied to animals it must be understood in its ordinary sense, in the absence of statutory definition." Citing *Gunn* v. *State*, 89 Ga. 341, 15 S. E. 458. The following extract would seem to accord very closely with the common use of the term: "I take the reservation of the right of shooting, fishing, and sporting, to be a reservation of the right to follow and shoot such animals as are under common parlance understood to be the subjects of sport. . . . But the word 'game' is not mentioned; and it is a perfectly undefined word, and one that has been used at various times in different senses, sometimes narrower, sometimes more comprehensive." *Jeffryes* v. *Evans*, 19 C. B. Reps. 243, 263. It would not be far from strict accuracy to say that the word "game" was originally applied to those animals and birds *feræ naturæ* which were valuable for food, and that at an early date the term was extended to cover quadrupeds yielding valuable fur, and birds sought for on account of handsome plumage. But general definitions (always perilous) are not of great assistance regarding the matters under consideration. Abbott's Law Dictionary, Vol. 1, after defining the word "game" substantially in accord with the foregoing definitions, adds: "But no general definition can be given indicating species that are within the term; for its extension varies in different localities, according to differences in the fauna of different regions, in the habits of various communities, and the statutes of different jurisdictions."

It would seem, therefore, that we are virtually relegated to a consideration of our own statutes relating to game, in seeking a proper construction of the provision under examination. At the outset it may be observed that the words "hunt" and "game" are used in the game law in a way not always consistent with any of the definitions above given, and that there is not a uni-

formity of meaning in all cases where these words occur throughout the title relating to game. A few illustrations are in point. General Statutes, § 3153, forbids any person to "hunt or take any wild hare or rabbit, except Belgian and German hares," etc. By the law existing up to 1915, Belgian and German hares enjoyed the same protection as other wild hares; see Public Acts of 1915, Chap. 167. Up to that time they were game, they were animals useful for food; did they cease to be game in 1915? They were just as useful for food, but their predatory habits had gotten them into disfavor, and now, by statute, their extermination is sought, and they may be killed "at any time without limitation as to number," and towns may offer a bounty for their destruction. By General Statutes, § 3284, hunting in a State game preserve is forbidden, but an exception is made whereby certain animals not desired in connection with the more valuable forms of game sought to be preserved, may be destroyed, and it is provided by way of exception that the superintendent of game, or some person by him designated, "may hunt, kill or trap foxes, skunks, raccoons, wild cats, minks, weasels, hawks, and owls in any State game preserve."

These animals and birds may be hunted, yet by statute the skunks and raccoons are protected while the others are outlawed. Yet the statute speaks of hunting all of them. By general opinion the fox has long been considered a game animal *par excellence*, valuable for fur and affording much sport in the chase—riding to hounds in its pursuit a distinguished and genteel variety of sport. Yet in Connecticut, on account of its predilection toward the hen-coop, it has fallen to such a low estate that any town may set a price upon its head by way of bounty. Is his pursuit at present hunting? Wild cats are subjects of bounty. Could one who set forth to kill them, or one who sought the woods in

quest of bear, be denied the title of a hunter? These suggestions are made not to formulate any definitions by consideration of our statutory provisions, but rather to indicate the futility of an attempt.

We must seek the proper construction of the section involved in this case by reference to the mischief which it is designed to combat, and its resemblance and analogy to certain other provisions ordinarily contained in game laws, and having a like design.

Game is protected not only by close seasons but in many other ways by regulations as to the number of any sort which may be taken in a day or during the season, by regulation of the methods of killing or capture and of sale and transportation. All provisions relating to the matters just mentioned are directed to preservation of game for sport and for the use of those who actually capture or kill it, that there may be a.fair amount always available for reproduction and renewal, and that commercialized taking—pot-hunting—may be prevented.

Sunday is a day of leisure and recreation, the varieties of amusement available and legal on that day, although now rapidly being enlarged is still limited, and many persons with a fondness for hunting and love of game food, who yet have no opportunity to exercise their wishes in this regard on secular days, would be expected then to seek the pleasure and excitement of the quest of game. The opportunity afforded by Sunday for general and promiscuous indulgence in hunting and shooting, and to some extent by persons lightly restrained by the instinct of true sportsmanship, undoubtedly would result in an undue and widespread destruction of game. In such a situation an Act forbidding hunting and shooting on Sunday, coupled with a provision making the possession of implements of hunting prima facie evidence of intent to violate the

prohibitions of the law, was a natural and obvious proceeding by way of remedy.

The construction of § 3173 is claimed by the defendant to be the same as if the words "protected game" were added after the words "shoot or hunt" in the statute. This certainly would penalize the killing of such game, but would it in any great measure protect that game from destruction. We think not, and therefore construe the words "shoot or hunt," without any implied qualification, and thereby broaden its effect in accordance with what we believe to be its intent, and to give the only construction adequate to effectuate its purpose.

In order to adequately enforce any given statutory provision, it has often been necessary, in legislating, to prohibit conduct and activities relating to the subject-matter of the enactment not integrally connected with its express terms. This has been the case in a marked way with legislation protecting game; it has been necessary to formulate it broadly and construe it liberally in accordance with its intent. It is undoubtedly the object of all laws for game protection, to secure a fair supply of game to those pursuing it in a lawful way for their own use, and to avoid such an exhaustion of the supply as would unduly limit its reproduction from year to year. At quite an early date in the history of game laws, the selling of game, the shipping of it beyond the State, or taking and holding it in possession for such purposes, was penalized. A familiar provision in such laws forbids the possession of game during the closed season. Laws so providing have been held generally to apply to the possession of game taken lawfully during the open season, although not so stating in terms. The great weight of authority construing laws of this general purport favors this construction. Leading cases are *Phelps* v. *Racey,* 60 N. Y. 10; *State* v. *Rodman,* 58

Minn. 393, 59 N. W. 1098.   And the same ruling has been made under similar statutes as regards game coming from another State, possessed during the closed season.   *Stevens* v. *State,* 89 Md. 669, 671, 43 Atl. 929; *People* v. *O'Neil,* 110 Mich. 324, 68 N. W. 227; *People* v. *Dornbos,* 127 Mich. 136, 86 N. W. 529; *Whitehead* v. *Smithers,* L. R. 2 C. P. Div. 553.   Like construction has been given to laws concerned with the killing of game during the open season as applied to animals of the same species domesticated and held in captivity. *Dieterich* v. *Fargo,* 194 N. Y. 359, 87 N. E. 518.

All of the decisions above cited proceed upon the principle that in order to carry out any provision intended for the protection of game, it is often necessary to extend the operation of the law so as to comprehend acts with reference to other animals than those with which the prohibited acts are directly concerned, in order to prevent the evasion of the prohibition primarily and chiefly intended.   We regard the instant case as coming within the principle and analogy of the decisions above referred to.   In these latter the words of the enactment were broadly construed and somewhat extended in context, to embrace acts and situations within the spirit of the enactments considered, and in view of the mischief to be remedied.   In construing the section under consideration as prohibiting shooting and hunting any variety of quadruped, bird, or other species of animal life, we are not called upon in any way to broaden or extend the meaning of the words used.   The word "game" is not contained in the section, and we have seen that there is nothing in other provisions of the law covering the general subject of hunting from which we can derive any technical and precise legal definition of that term.   As regards the words "shoot or hunt," there is nothing in the purpose of the section expressly declared or reasonably inferred, that compels us to con-

fine the words to indicating the pursuit of protected animals, or in any way to narrow the content of these words as they are understood in popular usage. To apply these words as meaning the pursuit of any form of animal life accords with the spirit and purpose of the enactment, and renders it of value in protecting such game as the law is concerned with as preserving for sport and safeguarding from depletion. To give to the provision the narrow construction contended for by the defendant, would render it toothless and ineffectual. We are therefore constrained to hold the narrow construction for which the defendant contends to be incorrect, and that the trial court properly interpreted the section in question.

It is contended by defendant that if § 3173 is to be construed literally, and so held to prohibit the protection of life and property by shooting on Sunday, it would be against public policy and for that reason void, because it would go to the extent of penalizing one who shot a burglar who was entering his home. Not this statute, nor any other, can be invalidated by a court as against public policy. The legislature is the arbiter of public policy, and its enactments can only be judicially set aside when contravening some constitutional provision, or when so insensible as to be incapable of a reasonable interpretation, or impossible of execution. If counsel really meant by this claim to urge the unconstitutionality of this section by reason of its being obnoxious to the constitutional right of every citizen to bear arms in defense of himself, the answer is that the obvious intention of this enactment is, as we have said, to prohibit shooting as a form of hunting birds and quadrupeds; that burglars are neither, and that as to them there is no closed season. In the same way provisions allowing owners of land to shoot or likewise kill certain quadrupeds and birds, when de-

stroying crops upon their land, are entirely in harmony with the provision under discussion, because such a proceeding can in no wise be considered hunting. As bearing upon the peculiar right of the General Assembly to legislate as to animals *feræ naturæ* on account of the ownership of property in them being in the State for the benefit of the people at large, as well as in exercise of the police power, see *Geer* v. *Connecticut,* 161 U. S. 519, 16 Sup. Ct. 600; *New York ex rel. Silz* v. *Hesterberg,* 211 U. S. 31, 29 Sup. Ct. 10.

It follows that the possession of an implement for hunting but not intended to be then used for that purpose, and the use of any such implement for the legitimate purpose of defense of one's person or property, cannot be regarded as acts in violation of this statute.

In the taxation of costs in the trial court, against the objection of defendant, an item of $10 was included as properly payable to the deputy game warden as provided in General Statutes, § 2212. Upon the facts appearing in the record, we think this item was properly taxed.

There is no error.

In this opinion the other judges concurred.