STATE OF CONNECTICUT *v.* EDWARD DABKOWSKI, JR.
(11342)

PETERS, C. J., HEALEY, DANNEHY, SANTANIELLO and CALLAHAN, Js.

Argued December 5, 1985—decision released March 18, 1986

*Monte P. Radler,* special public defender, for the appellant (defendant).

*John M. Massameno,* assistant state's attorney, with whom, on the brief, were *John M. Bailey,* state's attorney, *Edward Spinella,* former assistant state's attorney, and *William R. Domnarski,* special deputy assistant state's atorney, for the appellee (state).

ARTHUR H. HEALEY, J. After a trial to the jury on a two count information, the defendant was found guilty of sexual assault in the first degree, in violation of General Statutes § 53a-70, and guilty of unlawful restraint in the first degree, in violation of General Statutes § 53a-95.[1] This appeal followed.

On appeal, the defendant claims that the trial court erred (1) in admitting certain hearsay statements under the constancy of accusation doctrine because the "current breadth" of the hearsay exception which allows such testimony both as to the facts and contents of that accusation is no longer justified because of current developments in the law, and (2) in refusing to permit defense counsel to pursue, during cross-examination, a line of questioning involving the victim's "prior sexual activity within the two or three day period prior" to the alleged assault.

The jury could reasonably have found, inter alia, the following facts. On February 2, 1980, the victim C, then

---

[1] The second count of the information had originally charged the defendant with kidnapping in the second degree in violation of General Statutes § 53a-94 and he was found guilty of the lesser included offense.

eighteen years of age, met the defendant, an acquaintance, at a tavern in Bristol at about 6 or 6:30 p.m. She had had one drink of Seagram's and Seven at that tavern prior to his arrival there. He bought her another Seagram's and Seven as they talked. At about 8:30 p.m., C, the defendant, and a male friend left that tavern to go to another bar in an effort to meet C's sister there. C drove her own car while the defendant and his friend followed her in the defendant's Cadillac. C dropped her car off at her home and then got into the defendant's car. When the three arrived at the second bar, they did not find C's sister there. While there, the defendant bought C another Seagram's and Seven. All three left the bar together and the defendant dropped his male friend off at the latter's home. At about 9:30 p.m., the defendant and C drove to the house of one of the defendant's friends to buy some drugs. After going into his friend's house alone, the defendant returned with three quaalude tablets which he and C divided and consumed. C washed these drugs down with some beer that the defendant had with him. The two then went to a third bar where C began to feel the effects of the alcohol and the drugs. She felt dizzy, had trouble focusing and rested her head on the bar. Meanwhile, the defendant played pool and drank some alcoholic beverages. The defendant bought her yet another Seagram's and Seven. The bartender took note of her condition and, after speaking to the defendant about it, gave her some coffee.

The defendant and C left this bar between 10 and 10:30 p.m., and he assisted her into the front seat of his car as she had difficulty walking and entering the car. C believed that the defendant was taking her home and she fell asleep. She awoke a short time later to find that the defendant had driven her to a secluded area in Southington and the next thing she knew he was pulling her pants off. Her pants tore as he pulled them off.

She resisted, screaming and fighting, as he punched her and threatened to kill her. She tried to escape and while she was outside the car with her pants and panties off, the defendant dragged her on the ground back to the car. He held her and compelled her to engage in oral intercourse in the rear seat of the car. He attempted vaginal intercourse, but, according to the victim, he never ejaculated.

The assault left her with ripped clothing, bruises and scratches on her buttocks, facial bruises and some marks on her neck. During the assault, she scratched the defendant on the face. Before the defendant left the scene, he searched the area for his wallet and a package of Marlboro cigarettes which he had lost. He then drove her to B's house and she told B what had happened. B, who was a friend of C's family, immediately telephoned C's sister about the assault. B drove her home where she told her sister and her parents about the assault. Thereafter, C, her sister, her parents and B went to the Southington police department after first having tried unsuccessfully to find the wallet and cigarettes the defendant had lost at the assault scene. After giving a statement to policewoman Elizabeth Keegan, C was examined by a physician at New Britain General Hospital. Thereafter, between 5 and 6 a.m., C and the police went to the scene of the attack where they found the defendant's wallet and his Marlboro cigarettes.

At the trial, B, Keegan, C's sister and Detective Stanley Porter[2] each testified, over defense objection of hearsay,[3] as to what C had told each of them about the assault, including the details related to them by her.

---

[2] Porter became involved in the investigation of the assault on the morning of February 3, 1980, at which time he interviewed the victim C.

[3] C's sister was the third witness to testify under the constancy of accusation exception and the defendant objected to her testimony not only on the grounds of hearsay but also that it was repetitious and prejudicial.

In each instance, the trial court admitted this evidence under the "constancy of accusation" exception to the hearsay rule.[4] See, e.g., *State* v. *Ouellette,* 190 Conn. 84, 92, 459 A.2d 1005 (1983).

Essentially, the defendant argues that we should overrule our precedential case law and hold that the "current breadth" of the constancy of accusation testimony exception to the hearsay rule is no longer justified because of contemporary developments in the law and in psychiatry.[5] His fall-back position is that if we

---

[4] The trial court carefully cautioned the jury, on each of those four occasions, as to the limited use of the admission of the constancy of accusation evidence. In addition, it also did so when it charged the jury.

[5] The sole authority to which the defendant refers is a passage from 3A Wigmore, Evidence (Chadbourn Rev. 1970) § 924a from which he quotes selected portions of that passage. An examination of that passage is not helpful to the defendant. It notes that modern psychiatrists have "amply studied" the "psychic complexes" of the behavior of "errant young girls and women . . . ." 3A Wigmore, supra. It opines that one form taken by such complexes is "that of contriving false charges of sexual offenses by men." Id.

The passage makes the ultimate point that "[n]o judge should ever let a sex offense charge go to the jury unless the female complainant's social history and mental makeup have been examined and testified to by a qualified physician." Id.

This passage is not persuasive. The view expressed therein that the complaining witness should *always* be subject to such an examination hardly enjoys widespread acceptance. In *State* v. *Buckley,* 325 N.W.2d 169, 171 (N.D. 1982), the North Dakota Supreme Court said:

"Some authorities have suggested that the complaining witness, in a case relating to a sex offense, should *always* be compelled to submit to a psychiatric examination. See, 3A, Wigmore, Evidence, § 924a (Chadbourn rev. 1970). However, later case law, in what seems to be a majority of states, does not follow this concept. See, *State* v. *Wahrlich,* 105 Ariz. 102, 459 P.2d 727 (1969); *Ballard* v. *Superior Court,* 64 Cal. 2d 159, 49 Cal. Rptr. 302, 410 P.2d 838, 18 A.L.R.3d 1416 (1966); *People* v. *King,* 41 Colo. App. 177, 581 P.2d 739 (1978); *McDonald* v. *State,* 307 A.2d 796 (Del. 1973); *State* v. *Filson,* 101 Idaho 381, 613 P.2d 938 (1980); *People* v. *Glover,* 49 Ill. 2d 78, 273 N.E.2d 367 (1971); *State* v. *Gregg,* 226 Kan. 481, 602 P.2d 85 (1979); *People* v. *Davis,* 91 Mich. App. 434, 283 N.W.2d 768 (1979); *State* v. *Boisvert,* 119 N.H. 174, 400 A.2d 48 (1979); *State* v. *Romero,* 94 N.M. 22, 606 P.2d 1116 (N.M. App. 1980); *People* v. *Souvenir,* 373 N.Y.S.2d 824, 83 Mis. 2d 1038 (Crim. Ct. City of N.Y. 1975); *State* v. *Wounded Head,* 305 N.W.2d

do not repudiate that exception completely, we should at least hold that it does not permit such testimony to include the details of the crime involved.[6] The formulation of these positions, as now made on appeal, were not articulated in that manner in the trial court. Nevertheless, we do not dispose of this phase of his appeal by simply saying that we have been given no persuasive reason for overruling our oft-repeated precedents on this subject. The claims were functionally made and the record is adequate for our review. In

677 (S.D. 1981); *Forbes* v. *State,* 559 S.W.2d 318 (Tenn. 1977); *State* v. *Demos,* 94 Wash. 2d 733, 619 P.2d 968 (1980). *See,* Requiring Complaining Witness in Prosecution For Sex Crime To Submit To Psychiatric Examination, Annot., 18 A.L.R.3d 1433 (1968). These authorities stand for the proposition that the trial court has discretion to order a psychiatric examination of a complaining witness where compelling reasons are shown on the record.

"These authorities reflect, and apparently are in response to, the increased recognition that sex offense victims already have been put through a traumatic experience and are subject to further traumatic experience by being subjected to cross-examination concerning the incident. It necessarily follows that needless possibilities for increasing that trauma should be reduced as much as permissible." (Emphasis in original.)

In a case finding the rationale for the "Wigmore rule" unpersuasive, the Arizona Supreme Court said: "The 'Wigmore rule' once enjoyed considerable support, but this position has been largely repudiated. [Citations omitted.] The 'Wigmore rule' appears to be founded, not in fact, but in old attitudes critical of the credibility of a rape prosecutrix' testimony . . . ." *Murphy* v. *Superior Court in & for Maricopa County,* 142 Ariz. 273, 276, 689 P.2d 532 (1984). The North Carolina Supreme Court has opined that the Wigmore view is "completely unrealistic and unsound." *State* v. *Looney,* 294 N.C. 1, 18, 240 S.E.2d 612 (1978).

While it is true that there is a division of opinion as to ordering psychiatric examination in sex cases; see annot., 18 A.L.R.3d 1433, 1437; the "vast majority holds that the trial court does have discretion to order a psychiatric examination of the complaining witness where a compelling reason is shown." *State* v. *Demos,* 94 Wash. 2d 733, 738, 619 P.2d 968 (1980).

[6] Although objecting to the constancy of accusation testimony as hearsay in the trial court, the defendant did not refer to psychiatry nor to suasive contemporary supporting developments in the law. The trial court was not asked to limit such testimony to the fact of the complaint and to exclude the details.

rejecting the defendant's claims, we have not forgotten that " ' "[e]xperience can and often does demonstrate that a rule, once believed sound, needs modification to serve justice better." ' " *State* v. *Longo,* 192 Conn. 85, 95, 469 A.2d 1220 (1984) (*A. Healey, J.,* dissenting), quoting *Connecticut Junior Republic* v. *Sharon Hospital,* 188 Conn. 1, 17–18, 448 A.2d 190 (1982). The flexibility and capacity of the common law is its genius for growth and adaptation. "When common-law principles are no longer supportable in reason they are no longer supportable in fact." *Pendexter* v. *Pendexter,* 363 A.2d 743, 749 (Me. 1976) (Dufresne, C.J., concurring); see *Handeland* v. *Brown,* 216 N.W.2d 574 (Iowa 1974).

The target of the defendant's first claim of error is an evidentiary rule of long standing in this jurisdiction. "In sex-related crime cases, we have long recognized that a witness, to whom a victim has complained of the offense, could testify 'not only to the fact that a complaint was made but also to its details.' *State* v. *Segerberg,* 131 Conn. 546, 549, 41 A.2d 101 (1945). See *State* v. *Greene,* 161 Conn. 291, 294, 287 A.2d 386 (1971); *State* v. *Gelinas,* 160 Conn. 366, 367, 279 A.2d 552 (1971); *State* v. *Purvis,* 157 Conn. 198, 207, 251 A.2d 178 (1968), cert. denied, 395 U.S. 928, 89 S. Ct. 1788, 23 L. Ed. 2d 246 (1969); *State* v. *Dziob,* 133 Conn. 167, 169, 48 A.2d 377 (1946); *State* v. *Orlando,* 115 Conn. 672, 677, 163 A. 256 (1932); *State* v. *Sebastian,* 81 Conn. 1, 5, 69 A. 1054 (1908); *State* v. *Byrne,* 47 Conn. 465, 466 (1880); *State* v. *Kinney,* 44 Conn. 153, 155–57 (1876); *State* v. *De Wolf,* 8 Conn. 93, 99 (1830). 'Such testimony is admitted . . . when the complainant first has testified, in court, to the facts of the alleged occurrence, in order to corroborate her testimony. *State* v. *Orlando,* supra, [677].' " *State* v. *Brice,* 186 Conn. 449, 453, 442 A.2d 906 (1982). Just recently we have reiterated that "[t]here can be no serious question concerning the viability of the 'constancy of accusation'

exception to the hearsay rule in sex-related cases
. . . ." *State* v. *Ouellette,* supra, 97.

In pressing his argument for repudiating or, in the alternative, greatly constricting the constancy of accusation exception, the defendant asserts that the latest legislative developments "reflect a far more progressive approach to the prosecution of sexual crimes." The defendant points to legislative action in 1974 that, in repealing General Statutes § 53a-68, eliminated the requirement of corroboration to sustain a conviction in particular sexual offenses.[7] The legislative history of the repeal of § 53a-68 does not aid the defendant. 17 S. Proc., Pt. 3, 1974 Sess., pp. 1306–10; 17 H. R. Proc., Pt. 4, 1974 Sess., pp. 2005–10. In viewing § 53a-68 as a "capricious law" and as operating to cast complainants in such cases in an undignified, discriminating and demeaning manner, legislators urged that "the credibility of the plaintiff should be the sole requirement" and indicated that the jury could properly decide where the truth was.[8] 17 S. Proc., Pt. 3, 1974 Sess., pp. 1308, 1309; 17 H. R. Proc., Pt. 4, 1974 Sess., pp. 2005, 2006. There can be no question of the

---

[7] General Statutes § 53a-68, which was originally enacted as a part of the Penal Code in 1969; Public Acts 1969, No. 828, § 69; provided: "A person shall not be convicted of any offense under this part, or of an attempt to commit such offense, solely on the uncorroborated testimony of the alleged victim, except as hereinafter provided. Corroboration may be circumstantial. This section shall not apply to the offense of sexual contact in the third degree, nor to the offenses of prostitution, patronizing a prostitute, promoting prostitution or permitting prostitution."

[8] The proceedings on the floor of the Senate noted that "the repeal of General Statutes § 53a-68 would bring Connecticut in line with the other 49 states who do not require corroboration of all elements of a rape case. . . . Connecticut is now the only state in the union with such a law." 17 S. Proc., Pt. 3, 1974 Sess., pp. 1307, 1311.

We have said that "[p]rior to the enactment of § 53a-68, Connecticut did not require specific corroboration." *State* v. *Jonas,* 169 Conn. 566, 575, 363 A.2d 1378 (1975), cert. denied, 424 U.S. 923, 96 S. Ct. 1132, 47 L. Ed. 2d 331 (1976); see also *State* v. *Brice,* 186 Conn. 449, 458 n.10, 442 A.2d 906 (1982).

wisdom of the enlightened action of the legislature in repealing § 53a-68. In recognizing the legislative policy decision in repealing § 53a-68; see generally *State* v. *Gilletto,* 98 Conn. 702, 714, 120 A. 567 (1923); we acknowledge that relevant established principles militate against the defendant's claim. When the legislature acts, it is presumed to know the state of the law. *Pomfret School* v. *Pomfret,* 105 Conn. 456, 462, 136 A. 88 (1927); *Tolisano* v. *State,* 19 Conn. Sup. 266, 269, 111 A.2d 562 (1954) (*King, J.*) Thus, the legislature was presumed to have knowledge of the long-standing doctrine of constancy of accusation in such cases. "[W]hen the Legislature acts in a particular area, it does so with knowledge of and regard to the prior state of the law, including relevant decisions [of the Appellate Court]." *Scheve* v. *McPherson,* 44 Md. App. 398, 415, 408 A.2d 1071 (1979). It is presumed "to know the existing state of the case law in those areas in which it is legislating"; *Woodson* v. *State,* 95 Wash. 2d 257, 262, 623 P.2d 683 (1980); to be "cognizant of judicial decisions relevant to the subject matter of a statute"; *English* v. *Marin Municipal Water District,* 66 Cal. App. 3d 725, 731, 136 Cal. Rptr. 224 (1977); and "to know the state of existing relevant law when it enacts a statute." *State* v. *Reis,* 430 A.2d 749, 752 (R.I. 1981). The knowledge of the constancy of accusation exception established decades prior to the repeal of § 53a-68 may thus fairly be imputed to the legislature's knowledge when § 53a-68 was repealed in 1974. Despite this, the legislature took no legislative action incident to the repeal of § 53a-68 to annul or restrict the constancy of accusation exception; this has significance because of that doctrine's incontestible relevance to the area of legislative concern at that time.[9] See generally *Miller* v.

[9] The defendant's reference to the rape shield statute in General Statutes § 54-86f requires little discussion on his present claim. Under that statute "evidence of the sexual history of a sexual assault victim is now admissible only in clearly and narrowly defined circumstances established

*Eighth Utilities District,* 179 Conn. 589, 594, 427 A.2d 425 (1980); *Sawyer Savings Bank* v. *American Trading Co.,* 176 Conn. 185, 189–90, 405 A.2d 635 (1978).

In any event, the legislature did not act to change the hearsay exception challenged here. The legislative deliberations referred to concerning the importance of credibility and reliance on the jury to sift out the truth in such cases constitute some telling measure of their thinking. Almost ten years after the repeal of § 53a-68 we explicitly noted the continued viability of this exception "although the statutory requirement of corroboration was repealed [in 1974]." *State* v. *Ouellette,* supra, 97 n.12. Under our constancy of accusation exception the complainant and those to whom she complained are permitted to testify to both the complaint and its details. Rather than disadvantaging a defendant, such a doctrine supplies a fertile field for cross-examination of a complainant with reference to ascertaining where the truth lies. In *Bishop* v. *Copp,* 96 Conn. 571, 575, 114 A. 682 (1921), Chief Justice Wheeler said: "The test of cross-examination is the highest and most indispensable test known to the law for the discovery of truth." Wigmore, speaking even more strongly, said that cross-examination "is beyond any doubt the greatest legal engine ever invented for the discovery of truth." 5 Wigmore, Evidence (Chadbourn Rev. 1974) § 1367, p. 32.

Our present doctrine of constancy of accusation facilitates the prosecution of an outrage which is almost always "an inherently furtive act." *People* v. *Linzy,* 31

in a separate hearing." *State* v. *Rothenberg,* 195 Conn. 253, 259–60, 487 A.2d 545 (1985). This statute, which commendably serves to protect the victim's sexual privacy, allows her to testify in court under circumstances that guard against her undue embarrassment and is highly desirable legislation and is not at all inconsistent with the constancy of accusation exception. Both are rationally and socially adapted to ascertaining the truth in such cases.

N.Y.2d 99, 103, 286 N.E.2d 440, 335 N.Y.S.2d 45 (1972). We are aware that when a doctrine is of judicial origin, it may also be subject to judicial change. "[T]he [doctrine] follows where its reason leads; where the reason stops, there stops the [doctrine]." Karl Llewellyn, The Bramble Bush (1960) pp. 157–58; see *United States* v. *Schreiber,* 599 F.2d 534, 537 (3d Cir. 1979). The reason for our doctrine of constancy of accusation persists vigorously. We reject the defendant's challenge.[10]

We turn now to the defendant's claim that the trial court erred in excluding evidence concerning the victim's sexual activity within the two or three day period prior to the alleged assaults. We find no error on this ruling.

Certain evidence at the trial must be set out for a proper understanding of this claim. During cross-examination of the victim, she identified a pair of panties[11] as those she was wearing on the night of the alleged assault. The state had no objection to their admission as the panties she wore that night. The jury was excused and the state objected that the admission should not encompass any stains on them or any laboratory reports concerning them. The court admitted them as a full exhibit without any limitation. During the voir dire examination, C admitted to defense counsel that she had had "sexual activity" with her boyfriend within

---

[10] The defendant's challenge appears to include the assertion that one of the reasons we should repudiate or constrict this exception is that a number of other states do not follow it. While decisions of other state courts are extended respect and may, on occasion, be persuasive, we are not persuaded to repudiate or constrict our constancy of accusation exception. We accord, in every instance, respect and examination to such decisions even though "we have no obligation to adopt a rule just because it has generally been adopted elsewhere." *Handeland* v. *Brown,* 216 N.W.2d 574, 577 (Iowa 1974).

[11] The panties had previously been marked as a state's exhibit for identification.

two or three days prior to the alleged assault. The court sustained the state's objection to the admission of such evidence. Later in the trial, the defendant introduced evidence through Dr. Abraham Stolman, the state toxicologist, that there was a seminal stain on the panties.[12] The evidence adduced from C was equivocal on the matter of whether the defendant had ejaculated during the alleged assault.[13]

The defendant argues that our decision in *State* v. *Mastropetre,* 175 Conn. 512, 400 A.2d 276 (1978), is dispositive. The state also relies on *Mastropetre* to sustain the challenged ruling. The defendant argues that *Mastropetre* clearly implies that, in the limited circumstances of this case, inquiry into C's prior sexual relations within the two or three day period preceding the assault, in order to impeach her credibility, is an exception to the general rule which excludes evidence of prior sexual relations. It appears that he intended, by such inquiry, to attack her credibility by showing that someone else was responsible for the semen on the panties.

The trial court's ruling was correct for any one of several reasons. The first is that, under *Mastropetre,* a condition precedent to the admission of prior sexual activity evidence is that the documentary evidence of the semen involved must be introduced *before* cross-examination concerning prior sexual activity of the victim is proper.[14] *State* v. *Mastropetre,* supra, 520. This is in accord with our statement in *Mastropetre* that a " 'cross-examination as to the contents of a document

[12] Dr. Stolman also testified that two vaginal smear tests disclosed no sperm, as well as stating that the Johnson Rape Kit used when the physician examined C at the time of the alleged assault disclosed no sperm. In addition, he said that he could not match the semen stains on the panties to those in the rape kit because there was none in the latter.

[13] The state presented expert testimony to the effect that there could be seminal discharge without ejaculation.

[14] The trial of this case took place prior to the passage of the rape shield statute in 1982. Public Acts 1982, No. 82-230; see General Statutes § 54-86f.

and questions at least relating to, if not actually involving, the contents of the document should not be permitted unless the writing is in evidence.' " *State* v. *Mastropetre,* supra, 520. In this case, however, the laboratory report of Dr. Stolman identifying the stain on the panties as semen did not come into evidence until sometime *after* the defendant had introduced the panties and he had sought to cross-examine C on her prior sexual activity. The court's ruling finds support on this basis even though the court did not rely on this particular analysis. See *State* v. *Ouellette,* supra, 93; *Witek* v. *Southbury,* 132 Conn. 104, 110, 42 A.2d 843 (1945).

The defendant's claim is also flawed because he failed to lay a proper foundation to establish the relevancy of the excluded evidence in the first instance. In *Mastropetre,* quoting from *State* v. *Lombardo,* 163 Conn. 241, 243, 304 A.2d 36 (1972), we said: "One fact is relevant to another fact whenever, according to the common course of events, the existence of the one, taken alone or in connection with other facts, renders the existence of the other either certain or more probable." *State* v. *Mastropetre,* supra, 517. A proper foundation must be laid for the admission of evidence. See, e.g., *State* v. *Saia,* 167 Conn. 286, 291, 355 A.2d 88 (1974). The defendant did not adduce any evidence that the stained panties that C was wearing at the time of the alleged assault were the same ones she had been wearing two or three days earlier at the time of her sexual activity with her boyfriend.[15] This defect itself justifies the ruling of the trial court.[16] Thus, the evidentiary predicate for an attack on C's credibility was not at all established.

[15] We note, in this context, that the defendant did not adduce any evidence that any semen (if any there was) on C's person two or three days prior to the alleged assault by him could have produced the stain on the panties she was wearing on the night she was with him.

[16] The defendant's argument that the "semen in question was found on the panty which [C] wore on the night [of the alleged assault by the defend-

We agree with the state's argument on the context of relevancy that even had the semen on the panties been identified as having been that of C's boyfriend, that would not have rendered her prior sexual activity admissible because to do so would have to have been based on some evidence that semen had been deposited by the attacker who assaulted C. Because there was neither testimonial nor forensic evidence of that, no issue of relevancy really arose as to the origin of the seminal stain on the panties. McCormick observes: "In sum, relevant evidence is evidence that in some degree advances the inquiry. It is material and probative." McCormick, Evidence (3d Ed. 1984) § 185, p. 544. The evidence excluded would not have advanced the determination of the inquiry in this case. Moreover, to have it admitted would have subjected C to embarrassment and humiliation which the law of evidence now wisely surrounds with structured safeguards. See, e.g., General Statutes § 54-86f; *State* v. *Rothenberg,* 195 Conn. 253, 487 A.2d 545 (1985).

There is no error.

In this opinion the other judges concurred.

---

ant], as opposed to being found in [C] makes little practical difference." This completely overlooks the failure to establish any nexus between C's admitted sexual activity two or three days before the alleged assault and the stained panties.