STATE OF CONNECTICUT *v.* NEW ENGLAND HEALTH CARE EMPLOYEES UNION, DISTRICT 1199, AFL-CIO (SC 17044)

Sullivan, C. J., and Borden, Katz, Vertefeuille and Zarella, Js.

---

Argued January 14—officially released September 14, 2004

*Beth Z. Margulies*, assistant attorney general, with whom, on the brief, was *Richard Blumenthal,* attorney general, for the appellant (plaintiff).

*Michael E. Passero*, for the appellee (defendant).

*Opinion*

SULLIVAN, C. J. The plaintiff, the state of Connecticut, appeals[1] from the judgment of the trial court granting the application of the defendant, New England Health Care Employees Union, District 1199, AFL-CIO (union), to confirm an arbitration award. The arbitrator concluded that the department of mental retardation (department) did not have just cause to terminate the grievant, James Howell, a department employee and union member who had been dismissed after he was found to have abused a client, and ordered his reinstatement with a thirty day suspension. The state claims that the trial court improperly: (1) concluded that implementing the arbitration award reinstating Howell to a position within the department did not violate public policy; (2) issued a ruling on the application to confirm the award prior to ruling on the application to vacate the award; and (3) denied in part its motion to open the judgment and for reargument. We affirm the judgment of the trial court.

The record reveals the following procedural history and facts. The union and the state, through the department, were parties to a collective bargaining agreement

---

[1] The state appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

that covered the period from July 1, 1997, to June 30, 2001. The agreement provided for final and binding arbitration of disputes arising under the agreement. Howell, an employee of the department for eighteen years, worked for the Southbury training school, a residential facility for the mentally retarded. He worked in a position in which he had direct responsibility for the care and custody of the school's clients. On August 9, 1999, Howell was involved in an altercation with a client, identified only as Ed, who was blind and mentally retarded. As a result of the altercation, Ed was slightly injured. Lisa Miller, a coworker, subsequently reported the incident to a supervisor, James C. Hughes. Thereafter, Marianne Orazietti, a trained investigator and registered nurse from the department's patient advocate's office, investigated the incident. On the basis of Orazietti's investigation, the department conducted a predisciplinary hearing, after which it terminated Howell's employment. The union then submitted a grievance to arbitration regarding Howell's discharge. The arbitrator, David R. Bloodsworth, held a hearing at which both parties were provided the opportunity to submit evidence and to examine and cross-examine witnesses.

The arbitrator found the following facts. On August 9, 1999, Howell, Miller, and Ed, the client for whom Howell was responsible during that shift, were alone in a room. Howell, who had not worked regularly with Ed but was aware of his various behaviors and how to respond appropriately to them, attempted to assist Ed to the dining room for supper. When Ed began to act violently, Hughes came into the room and ordered Howell to "let Ed alone and let him calm down." It is unclear whether Howell followed this instruction. Ed's agitation continued, however, and he swung his arms vigorously. Miller and Howell gave conflicting accounts of what happened next. Miller claimed that Howell laughed at Ed, grabbed both of Ed's upper arms, and pushed him

forcibly into a reclining chair about four feet away. Howell denied that he had pushed Ed into the chair, but claimed that he had raised his arms to defend himself from Ed's blows, which caused Ed to "bounce" off of him and into the chair. It was undisputed that Ed fell hard into the chair and received a one half inch laceration when his arm was pinched between the chair and a side table.

The arbitrator found that Howell had deliberately shoved Ed into the chair and concluded that he was "culpable of patient or client abuse under these circumstances." The arbitrator then noted that the union had cited eleven cases where department employees had been disciplined instead of discharged, notwithstanding a finding of client abuse. Although he determined that the cases cited by the union were not similar factually to this case, the arbitrator found that "the state does not automatically terminate employees for patient abuse."[2] He further concluded: "From the arbitration awards, each involving the state and this union, I can only conclude that each case was decided on its own individual merits and that misconduct as serious as client abuse need not always provide just cause for an employee's dismissal." The arbitrator determined that although Howell "could have and should have exercised better judgment . . . [i]t was because the patient was swinging his arms about in an agitated state that Howell reacted improperly by holding onto his arms and [shoving] him into a chair." In light of his factual findings, coupled with his analysis of the other arbitration awards involving the state and the union, the arbitrator concluded that "while . . . the state had just cause to dis-

[2] The state correctly notes that the issue of whether the department treated Howell disparately is not presently before this court. Rather, the issue before this court is whether the reinstatement of a department employee, whom an arbitrator has found to have abused a department client, violates public policy.

cipline [Howell]," it "did not have just cause to dismiss [him]." The arbitrator then directed the department to reinstate Howell with lost pay and benefits, except for a thirty day disciplinary suspension period.

The state filed with the trial court an application to vacate the arbitrator's award on the ground that the arbitrator had exceeded his power in violation of the common law and within the meaning of General Statutes § 52-418 (a) (4)[3] by issuing an award that violated the clear public policy against reinstating a department employee who has abused a client. The union subsequently filed an application to confirm the arbitrator's award pursuant to General Statutes § 52-417.[4] The trial court granted the union's application to confirm the arbitrator's award, without issuing a written opinion and without issuing a ruling regarding the state's application to vacate the award. The state then filed, pursuant to Practice Book § 17-4,[5] a motion to open the judgment. The court thereafter granted the state's motion to open the judgment as to attorney's fees and costs only, but otherwise denied the motion. This appeal followed.

---

[3] General Statutes § 52-418 (a) provides in relevant part: "Upon the application of any party to an arbitration, the superior court . . . shall make an order vacating the award if it finds any of the following defects . . . (4) if the arbitrators have exceeded their powers or so imperfectly executed them that a mutual, final and definite award upon the subject matter submitted was not made."

[4] General Statutes § 52-417 provides in relevant part: "At any time within one year after an award has been rendered and the parties to the arbitration notified thereof, any party to the arbitration may make application to the superior court . . . for an order confirming the award. The court or judge shall grant such an order confirming the award unless the award is vacated, modified or corrected as prescribed in sections 52-418 and 52-419."

[5] Practice Book § 17-4 (a) provides in relevant part: "Unless otherwise provided by law and except in such cases in which the court has continuing jurisdiction, any civil judgment or decree rendered in the superior court may not be opened or set aside unless a motion to open or set aside is filed within four months succeeding the date on which notice was sent. . . ."

On April 23, 2002, shortly after filing its appeal, the state filed a motion for articulation or rectification because the trial court had not issued a ruling on the application to vacate the award. The trial court responded: "The motion to vacate was effectively denied by and for the reasons stated in the memorandum of decision in which the award was confirmed." At that point, however, the court had not issued a memorandum of decision in support of its granting of the union's application to confirm the award. Rather, the court had indicated its decision granting the union's application to confirm the award by crossing out "denied" on the plaintiff's application to vacate the award. On June 12, 2002, the state filed a motion for review of the ruling on the motion for articulation or rectification. The Appellate Court treated the state's motion as a motion for compliance with Practice Book § 64-1 and ordered the trial court to file a memorandum of decision. The trial court thereafter filed with the Appellate Court a memorandum of decision denying the state's application to vacate the award. The trial court explained that although the arbitrator found that Howell's conduct constituted "abuse," which is defined by General Statutes § 17a-247a (1) as "the wilful infliction by an employee of physical pain or injury," he had not deliberately harmed the client. The trial court concluded that "the unforeseeability and exigency of the situation coupled with . . . Howell's attempt to control the client [and] defuse the situation . . . lead the court to conclude that the reinstatement of . . . Howell is not violative of [the] public policy of protecting persons with mental retardation . . . ." We later transferred the appeal to this court.

I

The state first claims that the trial court improperly concluded that the arbitration award reinstating Howell did not violate public policy in light of the arbitrator's

determination that Howell had abused a department client. We disagree.

We begin with the applicable standard of review. "The well established general rule is that [w]hen the parties agree to arbitration and establish the authority of the arbitrator through the terms of their submission, the extent of our judicial review of the award is delineated by the scope of the parties' agreement. *American Universal Ins. Co.* v. *DelGreco*, 205 Conn. 178, 185, 530 A.2d 171 (1987). When the scope of the submission is unrestricted, the resulting award is not subject to de novo review even for errors of law so long as the award conforms to the submission. *Hartford* v. *Board of Mediation & Arbitration*, 211 Conn. 7, 14, 557 A.2d 1236 (1989); *New Haven* v. *AFSCME, Council 15, Local 530*, 208 Conn. 411, 415–16, 544 A.2d 186 (1988). Because we favor arbitration as a means of settling private disputes, we undertake judicial review of arbitration awards in a manner designed to minimize interference with an efficient and economical system of alternative dispute resolution. *Garrity* v. *McCaskey*, 223 Conn. 1, 4–5, 612 A.2d 742 (1992). Furthermore, in applying this general rule of deference to an arbitrator's award, [e]very reasonable presumption and intendment will be made in favor of the [arbitral] award and of the arbitrators' acts and proceedings. . . . *Metropolitan District Commission* v. *AFSCME, Council 4, Local 184*, 237 Conn. 114, 119, 676 A.2d 825 (1996).

"In *Garrity* v. *McCaskey*, supra, 223 Conn. 6, however, we also recognized two narrow common-law bases, as opposed to statutory bases under General Statutes § 52-418, for vacating an award rendered pursuant to an unrestricted submission: (1) the award rules on the constitutionality of a statute; and (2) the award violates clear public policy." (Internal quotation marks omitted.) *Groton* v. *United Steelworkers of America*,

254 Conn. 35, 43–45, 757 A.2d 501 (2000). Only the second ground is involved in the present case.

"[W]hen a challenge to a voluntary arbitration award rendered pursuant to an unrestricted submission raises a legitimate and colorable claim of violation of public policy, the question of whether the award violates public policy requires de novo judicial review." Id., 45. Because the challenge in this case raises such a claim, we undertake de novo review of the arbitrator's award.

It is undisputed that the submission to arbitration in this case was voluntary and unrestricted. The question is, therefore, whether the award falls within the public policy exception to the general rule of deference to an arbitrator's award made pursuant to an unrestricted submission. See id., 43. "The public policy exception applies only when the award is clearly illegal or clearly violative of a strong public policy. *Garrity* v. *McCaskey*, [supra, 223 Conn. 7]. A challenge that an award is in contravention of public policy is premised on the fact that the parties cannot expect an arbitration award approving conduct which is illegal or contrary to public policy to receive judicial endorsement any more than parties can expect a court to enforce such a contract between them. *Stamford* v. *Stamford Police Assn.*, [14 Conn. App. 257, 259, 540 A.2d 400 (1988)]; *Board of Trustees* v. *Federation of Technical College Teachers*, [179 Conn. 184, 195, 425 A.2d 1247 (1979)]. When a challenge to the arbitrator's authority is made on public policy grounds, however, the court is not concerned with the correctness of the arbitrator's decision but with the lawfulness of enforcing the award. *Board of Trustees* v. *Federation of Technical College Teachers*, supra [195]. Accordingly, the public policy exception to arbitral authority should be narrowly construed and [a] court's refusal to enforce an arbitrator's interpretation of [collective bargaining agreements] is limited to situations where the contract as interpreted would vio-

late some explicit public policy that is well defined and dominant, and is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests. [*United Paperworkers International Union, AFL-CIO* v. *Misco, Inc.*, 484 U.S. 29, 43, 108 S. Ct. 364, 98 L. Ed. 2d 286 (1987)]; see *W. R. Grace & Co.* v. *Rubber Workers*, 461 U.S. 757, 766, 103 S. Ct. 2177, 76 L. Ed. 2d 298 (1983) . . . . *New Haven* v. *AFSCME, Council 15, Local 530*, [supra, 208 Conn. 417]." (Internal quotation marks omitted.) *South Windsor* v. *South Windsor Police Union Local 1480, Council 15, AFSCME, AFL-CIO*, 255 Conn. 800, 815–16, 770 A.2d 14 (2001).

"The party challenging the award bears the burden of proving that illegality or conflict with public policy is clearly demonstrated. [*New Haven* v. *AFSCME, Council 15, Local 530*, supra, 208 Conn. 417]. Therefore, given the narrow scope of the public policy limitation on arbitral authority, the plaintiff can prevail . . . only if it demonstrates that the [arbitrators'] award clearly violates an established public policy mandate. . . . *Watertown Police Union Local 541* v. *Watertown*, 210 Conn. 333, 339–40, 555 A.2d 406 (1989). . . . *Groton* v. *United Steelworkers of America*, supra, [254 Conn. 45–46]. It bears emphasizing, moreover, that implicit in the stringent and narrow confines of this exception to the rule of deference to arbitrators' determinations, is the notion that the exception must not be interpreted so broadly as to swallow the rule." (Internal quotation marks omitted.) *South Windsor* v. *South Windsor Police Union Local 1480, Council 15, AFSCME, AFL-CIO*, supra, 255 Conn. 816.

The state argues that the trial court improperly granted the union's application to confirm the arbitrator's award ordering Howell's reinstatement despite the arbitrator's finding that Howell had abused a client, because there is a clear and dominant public policy,

expressed in numerous statutes and regulations, requiring the department to provide its clients with an environment free from the risk of abuse by its employees. The union counters that the trial court properly confirmed the arbitrator's award because it did not violate the explicit, well-defined and dominant public policy of this state as set forth in General Statutes § 17a-247c. We agree with the union.

A "two-step analysis . . . [is] often employed [in] deciding cases such as this. First, the court determines whether an explicit, well-defined and dominant public policy can be identified. If so, the court then decides if the arbitrator's award violated the public policy." (Internal quotation marks omitted.) *State* v. *AFSCME, Council 4, Local 387, AFL-CIO*, 252 Conn. 467, 476, 747 A.2d 480 (2000). Addressing the first prong of this test, the trial court stated: "The legislative and regulatory scheme respecting mental retardation reflects a clear, well-defined and dominant state public policy in favor of the care and protection of persons with mental retardation," and cited numerous statutory provisions supporting this public policy.[6] The trial court concluded that "[t]he existence of the state public policy to care for and protect mentally retarded persons necessarily includes a public policy to protect those mentally

---

[6] See, e.g., General Statutes § 17a-238 (b) ("[e]ach person placed or treated under the direction of the Commissioner of Mental Retardation in any public or private facility shall be protected from harm and receive humane and dignified treatment"); General Statutes § 17a-238 (e) (6) ("[t]he Commissioner of Mental Retardation shall ensure that each person placed or treated under the commissioner's direction in any public or private facility is afforded . . . the right to be free from unnecessary or excessive physical restraint"); General Statutes § 17a-247b (a) ("[t]he Department of Mental Retardation shall establish and maintain a registry of individuals who have been terminated or separated from employment as a result of substantiated abuse or neglect"); General Statutes § 17a-247c (a) ("[n]o employer shall hire an individual whose name appears on the registry and no employer shall retain an individual after receiving notice that an individual's name so appears").

retarded persons in the custody of [the department] and to provide them with an environment reasonably free from abuse." Given the clear statutory policy to protect persons under the care of the department from harm and its mandate that no employer shall hire or retain an individual terminated or separated from employment as a result of substantiated abuse, we agree with the trial court that there is an explicit, well-defined and dominant public policy against the mistreatment of persons in the department's custody. We therefore conclude that the first prong of the required inquiry is satisfied.

Addressing the second prong of the inquiry—whether the arbitrator's award violated the public policy of protecting persons in the custody of the department from abuse—the trial court concluded that, because Howell had not intended to harm the client and had never been disciplined for abusing a client prior to this incident,[7] the record did not support a finding that continuing Howell's employment would place department clients at risk of abuse. It concluded, therefore, that reinstating Howell would not violate public policy. We agree. To conclude that the arbitrator's decision and award violated the public policy of protecting persons in the custody of the department from abuse, the court would have had to conclude that, if a single instance of deliberate conduct results in any injury to a client, no matter how inadvertent or minor, the conduct is grounds for termination, per se. We agree with the union that such a rule is not required to advance the public policy of protecting clients from mistreatment. Rather, an arbitrator reasonably may consider circumstances such as the length of employment, previous instances of harmful conduct by the employee, and the circumstances

---

[7] The arbitrator noted in his memorandum of decision that Howell previously had received a "one-day suspension for his failure to follow established protocol" and a "five-day suspension for inattentiveness to duties."

and severity of the misconduct under review in determining the likelihood of future misconduct and whether discipline less severe than termination would constitute a sufficient punishment and deterrent. We also agree with the union that the rule urged by the state effectively would grant authority to the state to discharge an employee for such conduct without review, thereby undermining both the collective bargaining process and the arbitration process voluntarily agreed to by the parties. Accordingly, we conclude that the trial court properly concluded that the arbitrator's decision and award did not violate the public policy of protecting department clients from mistreatment.

The state argues, however, that, in making its finding that Howell had not intended to harm the client, the trial court improperly substituted its factual findings for the arbitrator's findings. It points out that the court stated in its memorandum of decision that the arbitrator had found that Howell's conduct constituted abuse within the meaning of § 17a-247a (1), which defines "abuse" as "the wilful infliction by an employee of physical pain or injury . . . ." Our review reveals, however, that the arbitrator did not specifically refer to that statute anywhere in his decision and award. Moreover, nothing in the arbitrator's decision suggests that he found that Howell wilfully had inflicted pain or injury on the client.[8] Instead, the arbitrator found only that, contrary to Howell's claim that he had merely raised his arms in an attempt to defend himself from the client's blows and that the client had "bounced" off of his arms into the chair, Howell deliberately had pushed Ed into the chair. Accordingly, we read the arbitrator's

---

[8] Indeed, the state did not argue to the arbitrator that Howell had wilfully inflicted pain or injury on Ed. Instead, it argued that he had forcibly and intentionally pushed Ed into the chair and these actions resulted in injury to Ed. Thus, the misconduct with which Howell was charged was not intentionally harming the client, but intentionally engaging in conduct that resulted in harm to the client.

finding that Howell had abused the client not as a finding that Howell had abused the client within the meaning of § 17a-247a (1), but rather as a loose reference to deliberate conduct that resulted in an inadvertent injury to the client. See, e.g., *Six* v. *Thomas O'Connor & Co.*, 235 Conn. 790, 801, 669 A.2d 1214 (1996) ("[b]ecause we are required to afford great deference to the [workers' compensation] commissioner's conclusion . . . provided that it is reasonably based on the evidence before him, we must interpret [his] finding . . . with the goal of sustaining that conclusion in light of all of the other supporting evidence"). We further conclude that the trial court's finding that Howell "intended to put a client into the chair but did not intend to hurt the client in doing so" was consistent with the arbitrator's finding.[9] Accordingly, we reject the state's claim that the trial court improperly substituted its findings for those of the arbitrator. Instead, we conclude that the court's assertion that the arbitrator found that Howell had abused a client within the meaning of § 17a-247a (1) was a harmless misstatement. We therefore reject this claim. We express no opinion, however, on whether reinstatement of an employee who has been found to have committed abuse as defined by that statute would violate public policy per se.

In addition, we are not persuaded by the cases cited by the state in support of its argument that reinstating

[9] The state concedes that the arbitrator did not refer to the statutory definition of abuse when he concluded that Howell had abused the client. It argues that the arbitrator was not obligated to make its decision according to law and that an arbitrator's errors of fact and law are not reviewable by the trial court. See *International Brotherhood of Police Officers, Local 361* v. *New Milford*, 81 Conn. App. 726, 731, 841 A.2d 706 (2004). The fact that the arbitrator was not *obligated* to apply the definition of § 17a-247a (1) in making his decision and award is irrelevant to our analysis, however. The trial court's conclusion that the statutory standard had not been met, i.e., that Howell had not intended to inflict pain or injury on the client, was not inconsistent with the arbitrator's finding because the arbitrator did not apply the statutory definition.

Howell would violate public policy. The facts of those cases are easily distinguishable from the facts in the present case. For example, Howell was not convicted of any crime.[10] Cf. *United States Postal Service* v. *American Postal Workers Union, AFL-CIO*, 736 F.2d 822, 823 (1st Cir. 1984) (employee convicted of embezzling postal funds); *Board of Education* v. *Local 566, Council 4, AFSCME*, 43 Conn. App. 499, 500, 683 A.2d 1036 (1996) (employee terminated following federal conviction for embezzling union funds), cert. denied, 239 Conn. 957, 688 A.2d 327 (1997). In addition, although Howell's conduct was improper, both the likelihood and potential magnitude of future harm are minimal. Cf. *Exxon Shipping Co.* v. *Exxon Seamen's Union*, 993 F.2d 357, 367 (3d Cir. 1993) (court vacated award reinstating oil tanker helmsman, discharged after testing positive for drug use after grounding his ship, because "[t]he magnitude of possible harm to the public [from a major oil spill distinguished that] case from those cases upholding arbitration awards against public policy challenges"); *Iowa Electric Light & Power Co.* v. *Local Union 204 of the International Brotherhood of Electrical Workers, AFL-CIO*, 834 F.2d 1424, 1430 (8th Cir. 1987) (court vacated arbitration award reinstating nuclear power plant employee discharged for deliberately disengaging system designed to protect public from exposure to harmful radiation). Furthermore, until this incident, Howell had never been disciplined for abusing a client during his eighteen years of service with the department, and there was no finding that he intended to harm the client. Cf. *Newsday, Inc.* v. *Long Island Typographical Union, No. 915, CWA, AFL-CIO*, 915 F.2d 840, 843 (2d Cir. 1990) (arbitrator's

---

[10] Furthermore, even assuming that Howell had been convicted of a crime for his conduct in this case, we have not concluded "that the violation of a criminal statute is a per se public policy violation sufficient to justify vacating an arbitrator's decision." *State* v. *AFSCME, Council 4, Local 387, AFL-CIO*, supra, 252 Conn. 477–78.

award reinstating grievant, notwithstanding his documented history of sexual harassment, would have unlawfully compelled female coworkers to submit to sexual harassment as condition of employment and would have violated employer's statutory duty to protect workforce from sexual harassment), cert. denied, 499 U.S. 922, 111 S. Ct. 1314, 113 L. Ed. 2d 247 (1991). In sum, notwithstanding Howell's improper action, we do not believe, on the basis of the facts of this isolated incident, combined with Howell's eighteen years of satisfactory service, that reinstating him violates this state's public policy in favor of the care and protection of persons with mental retardation.

## II

The state next claims that the trial court improperly issued a ruling on the application to confirm prior to ruling on the application to vacate. We disagree.

As we have noted, the state filed an application to vacate the arbitration award pursuant to § 52-418 and the union filed an application to confirm the arbitration award pursuant to § 52-417. In its judgment, the trial court stated that the "[union's] application to confirm is granted . . . ." It did not rule on the application to vacate, however, until after this appeal was filed and the state had filed its motion for review of the ruling on its motion for articulation or rectification. Only after the Appellate Court granted that motion, which it treated as a motion for compliance with Practice Book § 64-1, did the trial court issue a memorandum of decision explaining the basis for its confirmation of the arbitrator's award and its denial of the state's motions to vacate and open the judgment.

The state relies on *South Windsor* v. *South Windsor Police Union Local 1480, Council 15, AFSCME, AFL-CIO,* supra, 255 Conn. 827, in support of its claim. In that case, the trial court granted the plaintiff's application to

vacate and denied the defendant's motion to confirm an arbitration award. Id., 813. The defendant then appealed from the trial court's judgment to the Appellate Court, and the Appellate Court affirmed the trial court's judgment vacating the award. Id., 813–14. We reversed the judgment of the Appellate Court and remanded the case to the Appellate Court "with direction to reverse the judgment of the trial court, and to remand the case to that court with direction to grant the defendant's motion to confirm the award." Id., 827. The state argues that the *South Windsor* case establishes that "an adverse ruling on an application to vacate is necessary before granting an application to confirm because the court [in that case] did not simply remand to grant the application to confirm, but rather first reversed [the trial court's] judgment [vacating the award]." We disagree.

We recognize that applications to confirm and applications to vacate arbitration awards are distinct statutory proceedings.[11] Consequently, the preferred practice would be for the trial court to issue separate rulings on the applications. When both an application to confirm an award and an application to vacate the award are pending before the same trial court and the court grants the application to confirm without ruling on the application to vacate, however, it is logical to assume that the ruling is premised on the court's prior consideration and rejection of the application to vacate. Indeed, in the present case, there is no need to make such an assumption because, after ruling on the union's application to confirm and in response to the state's motion for articulation, the trial court expressly indicated that that was the case and issued a memorandum of decision explaining its reasons for denying the application to

[11] Although an application to confirm an arbitration award and a motion to vacate the award frequently are entertained in the same proceeding, they may be brought as entirely separate proceedings. See *Aetna Life & Casualty Co.* v. *Bulaong*, 218 Conn. 51, 52 n.1, 588 A.2d 138 (1991).

vacate the award. Under these circumstances, we cannot perceive what would be gained by reversing the court's ruling on the application to confirm and remanding the case to the trial court to allow it specifically to deny the application to vacate before granting the application to confirm. Accordingly, we reject this claim.

### III

Finally, the state claims that the trial court improperly denied its motion to open the judgment and for reargument. We disagree.

The principles that govern motions to open or set aside a civil judgment are well established. "A motion to open and vacate a judgment . . . is addressed to the [trial] court's discretion, and the action of the trial court will not be disturbed on appeal unless it acted unreasonably and in clear abuse of its discretion. . . . In determining whether the trial court abused its discretion, this court must make every reasonable presumption in favor of its action. . . . The manner in which [this] discretion is exercised will not be disturbed so long as the court could reasonably conclude as it did." (Citations omitted; internal quotation marks omitted.) *Gillis* v. *Gillis*, 214 Conn. 336, 340–41, 572 A.2d 323 (1990).

In support of its argument that the trial court improperly denied its motion to open the judgment and for reargument, the state relies on the same public policy arguments that we addressed in part I of this opinion. Having rejected those arguments, we conclude that the trial court did not act unreasonably or in clear abuse of its discretion.

The judgment is affirmed.

In this opinion BORDEN, KATZ and VERTEFEUILLE, Js., concurred.

ZARELLA, J., dissenting in part. The majority concludes that the arbitrator's reinstatement of the grievant, James Howell, who was found by the arbitrator to have abused a client, did not violate the public policy of protecting clients in the care and custody of the department of mental retardation (department) from harm and providing such clients with humane and dignified treatment. I respectfully disagree with this conclusion and therefore dissent.

In undertaking the two step analysis required when considering public policy challenges to arbitration awards, the majority begins by noting that there is an "explicit, well-defined and dominant public policy" against the mistreatment of persons in the department's custody. The majority then determines that, "because Howell had not intended to harm the client and had never been disciplined for abusing a client prior to this incident, the record did not support a finding that continuing Howell's employment would place department clients at risk of abuse." The majority thus agrees with the trial court's conclusion that reinstating Howell to his position in the department as a mental retardation worker with direct responsibilities for the care and custody of department clients will not result in a violation of public policy.

I depart from the reasoning of the majority because it conflicts with the arbitrator's express conclusion that Howell abused the client. The majority initially concedes that the arbitrator concluded that Howell abused the client. It nevertheless determines that the arbitrator could not have meant that the client was abused within the meaning of General Statutes § 17a-247a (1), which defines "abuse" in relevant part as "the wilful infliction by an employee of physical pain or injury," because the arbitrator (1) did not refer specifically to § 17a-247a (1) when he concluded that Howell had abused the client, and (2) did not make a separate finding "that Howell

wilfully had inflicted pain or injury on the client" during the incident in question. The majority thus concludes that the arbitrator used the term "abuse" only "loose[ly]" in referring to the deliberate conduct by Howell that resulted in the client's "inadvertent injury . . . ."[1] I believe that, not only is there no basis in the record to support the majority's reasoning, but the majority, in effect, is improperly substituting its own factual findings for the findings of the arbitrator. See *Board of Education* v. *Local 566, Council 4, AFSCME*, 43 Conn. App. 499, 506–507, 683 A.2d 1036 (1996) (courts lack authority to substitute factual findings for those of arbitrator), cert. denied, 239 Conn. 957, 688 A.2d 327 (1997), citing *United Paperworkers International Union* v. *Misco, Inc.*, 484 U.S. 29, 44–45, 108 S. Ct. 364, 98 L. Ed. 2d 286 (1987).

I agree that the arbitrator did not make a specific finding that Howell intended to harm the client, nor did he refer directly to § 17a-247a (1), but the arbitrator plainly stated that Howell "was culpable of patient or client abuse . . . ." The majority cites no department rule or other governing authority that requires the arbitrator to refer to § 17a-247a (1) when making a finding of client abuse. Consequently, I submit that the arbitrator's finding that Howell abused the client means exactly what it says.

Moreover, in explaining his conclusion that Howell was culpable of client abuse, the arbitrator specifically referred to the fact that (1) Howell, who had knowledge of the client's behavioral problems and how to respond to them properly, attempted to bring the agitated client into the dining room following a supervisor's advice to leave the client alone and to give him time to calm

---

[1] The majority dismisses as a "harmless misstatement" the trial court's assertion that the arbitrator made a finding that Howell had abused the client within the meaning of § 17a-247a (1).

down, (2) Howell laughed at the client, a blind and retarded man who could have believed that he was being mocked, (3) Howell's actions were deliberate and not spontaneous, (4) Howell's verbal behavior demonstrated his own anger and agitation, and (5) Howell shoved the blind and emotionally disturbed client four feet backward into a nearby chair. In short, the arbitrator found that Howell was culpable of client abuse because Howell, in a state of anger and agitation, deliberately rejected his supervisor's advice to give the blind and emotionally disturbed client time to calm down, deliberately laughed at the client in a manner that the client could have construed as mocking and deliberately shoved the client backward into a chair that was four feet away, thereby causing him injury. In my view, these factual findings fully support the arbitrator's conclusion that Howell abused the client.

Furthermore, the arbitrator used the term "abuse" more than one dozen times throughout the opinion to describe the type of misconduct at issue, such as when he referred to "the department's rules against client abuse and neglect," "an in-service course covering the subject[s] of abuse and neglect," the department's "abuse and neglect policy," "the abuse of vulnerable retarded clients," employee "discipline . . . for patient abuse," the reduction by arbitrators of penalties imposed for "client abuse," and the employee's "obligation to report instances of patient abuse." There is no indication that the arbitrator's references to abuse were to anything other than conduct in violation of the stated public policy of protecting department clients from mistreatment or harm.

That the arbitrator was referring to client "abuse" as defined by § 17a-247a (1), and not to conduct of some lesser magnitude, is supported by the fact that the arbitrator referred in his opinion to the department's determination, following an investigation and hearing on the

matter, that Howell "forcibly and intentionally pushed the patient into a chair in violation of [the department's] abuse and neglect policy." Because the arbitrator had knowledge of the department's abuse and neglect policy, it would seem only reasonable to assume that he also knew that the department was required to follow the procedures set forth in § 17a-247e-2 (f) (3) (A) of the Regulations of Connecticut State Agencies, which provides in relevant part that allegations of abuse or neglect by an authorized agency must be "*substantiated in accordance with the definitions set forth in Section 17a-247a of the Connecticut General Statutes* . . . ." (Emphasis added.) Accordingly, it strains credulity to conclude that the arbitrator's use of the term "abuse," in relation to Howell, differed from the arbitrator's use of that term in other portions of the opinion. Indeed, if the arbitrator had intended to distinguish his own finding of client abuse from the finding of the department, he presumably would have done so expressly.

In the closing lines of his opinion, the arbitrator states that Howell "could have and should have exercised better judgment. It was because the [client] was swinging his arms about in an agitated state that Howell reacted improperly by holding onto his arms and [shoving] him into a chair." We recently observed that poor judgment should not render an employee's misconduct excusable. See *State* v. *AFSCME, Council 4, Local 387, AFL-CIO,* 252 Conn. 467, 477, 747 A.2d 480 (2000).

In *State* v. *AFSCME, Council 4, Local 387, AFL-CIO,* supra, 252 Conn. 469, a correctional officer employed by the state department of correction was terminated because he had made an anonymous telephone call to a state legislator from a correctional facility telephone during working hours and had left a profane and racist message on the legislator's voice mail. As a result of this incident, the employee also was charged with harassment in the second degree in violation of General

Statutes § 53a-183 (a). Id. Following his termination, the employee filed a grievance, claiming that he had been "discharged without cause and that the discipline was too severe." Id., 470. The arbitrator vacated the termination and ordered reinstatement following a sixty working day suspension. Id., 471. The arbitrator's award was predicated on the employee's apology and a finding of mitigating circumstances arising from the employee's personal and family situation. Id., 479 (*Peters, J.*, concurring). The state filed an application to vacate the arbitration award and the trial court granted the state's application. Id., 471–72. On appeal, this court cited with approval the trial court's conclusion that, although the arbitrator had attempted to excuse the employee's conduct "as the outgrowth of various personal stressors"; (internal quotation marks omitted) id., 477; the reinstatement of the employee, despite his conduct, would minimize "society's overriding interest in preventing conduct such as that at issue in th[e] case from occurring. Thus, the award—with its inherent rationalization of [such] conduct . . . which was violative of statute and regulations—is in itself violative of clear public policy. . . . A lesser sanction . . . would, very simply, send the message that stress, or poor judgment, or other factors, somehow [render] the conduct permissible or excusable." (Internal quotation marks omitted.) Id.

In the present case, the misconduct at issue was equally or even more disturbing than the misconduct in *AFSCME, Council 4, Local 387, AFL-CIO* because it involved the physical pushing or shoving of a completely defenseless client. Additionally, Howell not only refused to admit to the misconduct at issue, but emphatically denied that he pushed or shoved the client toward the chair, asserting, instead, that he had been trying to protect himself from the *client's* blows when the client "bounced off" him and fell into the chair. The arbitrator

did not find this testimony credible and concluded that Howell had abused the client. Accordingly, the only remaining question for this court to consider in light of the arbitrator's conclusion is whether the arbitrator's award is in violation of public policy. See, e.g., *New Haven* v. *AFSCME, Council 15, Local 530, AFL-CIO*, 208 Conn. 411, 416, 544 A.2d 186 (1988). I submit that it is.

The public policy at issue in this case is the protection of mentally retarded persons in the care of public or private facilities from harm and the provision of humane and dignified treatment to such persons. See generally General Statutes § 17a-238. The arbitrator made an explicit finding that Howell, who was angry and agitated at the time of the incident, had abused the client by disobeying the supervisor's instruction to give the client time to calm down and by deliberately shoving him into a chair, which resulted in the client's injury. The arbitrator's finding that Howell was angry when the incident occurred makes the arbitrator's ultimate finding of abuse particularly compelling. To reinstate Howell following such an incident would be in clear violation of the "explicit, well-defined and dominant public policy" against the mistreatment of retarded persons in the department's custody because such reinstatement would allow a known abuser to return to a position involving direct responsibility for the care and custody of persons who are almost totally dependent on their caretakers. Consequently, the reinstatement of Howell would place future department clients at risk of abuse.[2]

The majority nonetheless concludes that the arbitrator's award does not violate public policy because to

[2] The trial court's statement that the clear and dominant public policy at issue is to provide mentally retarded persons "with an environment *reasonably free* from abuse" is a misstatement of the law that borders on the outrageous and should be emphatically disavowed by the majority. (Emphasis added.)

conclude otherwise would mean that, "if a single instance of deliberate conduct results in any injury to a client, no matter how inadvertent or minor, the conduct is grounds for termination, per se." According to the majority, such a rule would vest the state with "authority . . . to discharge an employee for such conduct without review, thereby undermining both the collective bargaining process and the arbitration process voluntarily agreed to by the parties." I disagree that vacating the arbitrator's award in this case will mean that, in the future, any single instance of deliberate misconduct by an employee that results in injury or harm to a client will become automatic grounds for termination.

In my view, whether the disputed conduct is deliberate and whether it results in physical pain or injury to the client are issues that the arbitrator must decide when making his initial determination as to whether the client was abused. See General Statutes § 17a-247a (1). If the arbitrator finds that the employee's conduct, although deliberate, did not result in physical pain or injury to the client, he presumably will not conclude that the employee abused the client. If, on the other hand, the arbitrator finds that the misconduct was sufficiently callous or severe, under the circumstances, to support a finding that the employee abused the client, the only duty of the court is to examine whether the arbitrator's award is in violation of public policy.

The majority, by contrast, states that the arbitrator may consider factors such as the circumstances and severity of the employee's misconduct *following* his finding of abuse when determining an appropriate *award*. I disagree because the public policy at issue in this case requires that persons in the custody of the department be protected from harm and receive humane and dignified treatment. I therefore concede that a finding of client abuse almost certainly will result

in the termination of the employee. That is why findings of client abuse must be made carefully and supported by substantial evidence. If the evidence establishes that the employee's misconduct does not rise to the level of abuse, it should not be characterized as such. In the present case, the arbitrator's conclusion that Howell abused the client was supported by numerous factual findings and, therefore, does not permit further examination of whether just cause existed for Howell's dismissal. Accordingly, I respectfully dissent.