******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

ESPINOSA, J., concurring. In today's decision, this court concludes that an arbitrator's award that effectively precludes an employer from terminating an employee who was abusing drugs on the job does not violate public policy. Because this result is legally required by this court's recent decision in *Burr Road Operating Co. II, LLC* v. *New England Health Care Employees Union, District 1199*, 316 Conn. 618, 114 A.3d 144 (2015) (*Burr Road*), the principle of stare decisis compels me—reluctantly—to concur in the judgment reversing the trial court's denial of the application filed by the named defendant, Connecticut Employees Union Independent, to confirm the arbitrator's award to reinstate the grievant, Gregory Linhoff. I write separately to emphasize that, although *Burr Road* made significant progress in synthesizing and clarifying our jurisprudence in this area of the law, it is my belief that—as the plainly outrageous outcome in the present case demonstrates—we should consider modifying the analysis set forth in *Burr Road* in order to provide for a more flexible approach when reviewing whether an arbitration award contravenes public policy. In particular, I believe that our analysis should afford a more prominent role to the message that an award sends to the public at large concerning the public policies at issue. As the present case has provided this court with the opportunity to apply the *Burr Road* factors to a new factual scenario, I am now convinced that the net effect of our decision in *Burr Road* is to take the already narrow confines of our review of arbitration awards that are claimed to violate public policy and further narrow it to the point where this court will simply rubber stamp those awards without any meaningful review on our part.

I begin with a review of our decision in *Burr Road* and how we used that decision as a vehicle to clarify our case law in this area. In *Burr Road*, we considered whether an arbitrator's award reducing the penalty received by the grievant, a certified nursing assistant, from termination of employment to a one month unpaid suspension for failing to promptly report suspected patient abuse, violated the state's public policy in favor of protecting vulnerable persons residing in nursing homes. Id., 620. The particulars of the grievant's case in *Burr Road* were less egregious than the facts of the present case. After overhearing a conversation between two coworkers, the grievant became suspicious that a patient may have been physically mistreated by a staff member at the nursing home where the grievant was employed. Id., 622–23. The grievant did not officially report the suspected abuse, however, until several days later when she had the opportunity to speak with the

patient who confirmed the grievant's suspicions that a staff member had behaved in a "rough" manner and had spoken "gruffly" while assisting the patient. Id., 623. Following an internal investigation, the grievant was terminated for her failure to timely report the suspected misconduct—a penalty significantly more severe than that received by the employees actually involved in the misconduct. Id., 624–25. The grievant contested her termination and an arbitrator ultimately issued an award reinstating the grievant and determining that she had been terminated without just cause. Id., 627.

Prior to addressing the substantive claim in *Burr Road*, however, we took the opportunity to review our prior decisions in which employers had challenged arbitration awards reinstating terminated employees on the basis that the awards violated a clear public policy. Id., 632. Of our previous decisions, we noted that our outcomes were evenly split as to whether the award at issue in the case violated public policy and further observed this was "an area of the law in which consensus has proved elusive" due to the numerous concurring and dissenting opinions filed in those previous decisions. Id., 632–33; see *Stratford* v. *AFSCME, Council 15, Local 407*, 315 Conn. 49, 105 A.3d 148 (2014); *State* v. *AFSCME, Council 4, Local 391*, 309 Conn. 519, 69 A.3d 927 (2013); *State* v. *New England Health Care Employees Union, District 1199, AFL-CIO*, 271 Conn. 127, 855 A.2d 964 (2004); *South Windsor* v. *South Windsor Police Union Local 1480, Council 15, AFSCME, AFL-CIO*, 255 Conn. 800, 770 A.2d 14 (2001); *Groton* v. *United Steelworkers of America*, 254 Conn. 35, 757 A.2d 501 (2000); *State* v. *AFSCME, Council 4, Local 387, AFL-CIO*, 252 Conn. 467, 747 A.2d 480 (2000).

In order to quell any uncertainty stemming from these prior decisions, our decision in *Burr Road* set out to "clarify the factors a reviewing court should consider when evaluating a claim that an arbitration award reinstating a terminated employee violates public policy, and, by extension, the types of factual findings an arbitrator may make in order to assist a reviewing court in considering such a challenge." *Burr Road*, supra, 316 Conn. 633. We distilled from our prior decisions those factors that we "expressly or implicitly" relied on to determine whether a grievant's termination is necessary to vindicate a particular public policy, namely: "(1) any guidance offered by the relevant statutes, regulations, and other embodiments of the public policy at issue; (2) whether the employment at issue implicates public safety or the public trust; (3) the relative egregiousness of the grievant's conduct; and (4) whether the grievant is incorrigible." Id., 634.

As to each factor, we also articulated the applicable standard of review. For the first factor, we recognized that "[w]hether sources of public policy themselves

mandate termination is a question of law subject to plenary review." Id., 635; *State* v. *AFSCME, Council 4, Local 391*, supra, 309 Conn. 528–29. In regard to the second factor, we concluded that because it "hinges on general questions of law and policy" it is "subject to plenary judicial review." *Burr Road*, supra, 316 Conn. 637. Under the remaining two factors, however, our review is much more deferential to the arbitrator's findings and determinations. Recognizing that "the factual findings of the arbitrator . . . are not subject to judicial review," we clarified that, under the third factor, "[w]e defer . . . to the arbitrator's ultimate determination whether termination was a just or appropriate punishment for the conduct at issue." Id., 638. We observed, however, that given the importance of public policy claims, "we review de novo the question whether the remedy fashioned by the arbitrator is sufficient to vindicate the public policies at issue." Id., 639. Finally, in regard to the fourth factor, we acknowledged that we "must defer to an arbitrator's assessment—whether express or implied—that a particular employee is unlikely to reoffend if reinstated." Id., 640.

We next proceeded to resolve the claim raised by the defendant union on the grievant's behalf under the clarified factors. Id., 640–41. After first determining that the first two factors were neutral; id., 644, 645; we concluded that under the third factor, the grievant's delay in reporting suspected patient abuse was not so egregious that public policy required her termination. Id., 648–49. Specifically, we noted that the arbitrator determined that the grievant's conduct—failing to report the suspected abuse through the proper channels—was markedly less egregious than the actions of the other employees involved in the incident, namely, misconduct toward a patient. Id., 646. Relying on and in deference to the arbitrator's factual findings, we concluded that the grievant's conduct "was devoid of insidious motives" and, as in previous cases in which we had upheld such awards, "there was no evidence of intent to harm the [patient], the magnitude of the harm was minimal, and the conduct itself was not criminal in nature." Id., 646–47. We concluded that the finding of the arbitrator that the grievant was unlikely to reoffend resolved the fourth factor. Id., 649. In sum, we concluded that confirmation of the award did not run counter to public policy and we reversed the judgment of the Appellate Court ordering the trial court to grant the application to vacate the award. Id., 621, 651.

In the time that has elapsed between our decision in *Burr Road* and today's decision, courts have applied the analysis and factors that we articulated in *Burr Road* in at least two other cases.[1] See *Bridgeport Board of Education* v. *NAGE, Local RI-200*, 160 Conn. App. 482, 125 A.3d 658 (2015); *East Hartford* v. *East Hartford Police Officers' Assn.*, Superior Court, judicial district of Hartford, Docket No. CV-14-6055713-S (March 2,

2016) (61 Conn. L. Rptr. 863). Although I recognize that the four cases in which the *Burr Road* factors have been applied provide only a limited sample size, I observe that in three of those cases—*Burr Road, East Hartford Police Officers' Assn.*, and the present case— the court upheld the contested arbitration award, whereas in only one case—*Bridgeport Board of Education*—did the court vacate an arbitration award. These decisions illustrate that the *Burr Road* factors have produced certain unintended effects and are in need of modification in order to prevent future judicial review of arbitration awards challenged on public policy grounds from becoming a rubber stamp process in which the reviewing court is required to gloss over the arbitration award without conducting any meaningful inquiry. As this court has previously observed, "[e]xperience can and often does demonstrate that a rule, once believed sound, needs modification to serve justice better." (Internal quotation marks omitted.) *Connecticut Junior Republic* v. *Sharon Hospital*, 188 Conn. 1, 17–18, 448 A.2d 190 (1982); *State* v. *Dabkowski*, 199 Conn. 193, 199, 506 A.2d 118 (1986) ("[t]he flexibility and capacity of the common law is its genius for growth and adaptation").

The arbitration award at issue in *East Hartford Police Officers' Assn.* reinstated a police officer who had been terminated after it was discovered that he had improperly accessed an investigative database in order to obtain personal information about a former girlfriend and other individuals. *East Hartford* v. *East Hartford Police Officers' Assn.*, supra, 61 Conn. L. Rptr. 863. In reviewing the arbitration award, the trial court first recognized that the award did indeed implicate a public policy, namely the public trust placed in the police given their ability to access confidential information. Id., 864. After reciting the four factors in *Burr Road*, the trial court concluded that the award implicated public safety and public trust but that the public policy did "not mandate termination." Id. The court then concluded that under the third factor, the "offense was egregious," but that the arbitrator did not find the grievant to be incorrigible. Id. Accordingly, the trial court denied the plaintiff's motion to vacate the award. Id.

The second case, *Bridgeport Board of Education*, although far more demonstrative of the application of the *Burr Road* factors, involved such extreme facts that the factors inarguably weighed against the award. The grievant, a custodian employed by the Bridgeport public school system, was terminated after sending several packets of handwritten and printed materials related to recent mass school shootings to various members of the Bridgeport city government and school system. *Bridgeport Board of Education* v. *NAGE, Local RI-200*, supra, 160 Conn. App. 485. The handwritten notes from the grievant indicated that he was prepared to carry out a similar atrocity unless his grievances with a supervisor

were addressed. Id., 485–86. A panel of arbitrators determined that the grievant's actions were a "cry for help" and issued an award reinstating the grievant. (Internal quotation marks omitted.) Id., 488.

The Appellate Court reversed the trial court's judgment denying the plaintiff's application to vacate the arbitration award. Id., 505–506. The Appellate Court first recognized that the case implicated "well established public policies prohibiting workplace violence, threatening and harassment, and promoting safe settings for Connecticut public schools." Id., 491. Under the first factor, the Appellate Court concluded that "[t]he answer to this question weighs heavily in favor of vacating the arbitration award" given the "intolerable" nature of the grievant's acts. Id., 496–97. In regard to the second factor, the Appellate Court explicitly disavowed the union's argument that because the grievant was only a custodian his position did not implicate the public trust or safety by concluding that his conduct put students and the public at risk. Id., 497–98. Under the third factor, the Appellate Court disagreed with the arbitration panel's determination that the grievant's conduct was a "cry for help," and noted that excusing the grievant's conduct due to his personal stress would send an unacceptable message that such impermissible conduct would be tolerated if motivated by stress or poor judgment. (Internal quotation marks omitted.) Id., 502. Under the fourth factor, the arbitration panel had concluded that the grievant was not likely to repeat his offensive conduct, but the Appellate Court, however, concluded that there was a high likelihood of recidivism, given that the grievant had been subject to prior discipline in his current position and that any penalty short of termination would not serve to deter future similar conduct. Id., 505. As all of the *Burr Road* factors weighed in favor of vacating the arbitration award, the Appellate Court reversed the judgment of the trial court. Id., 505–506.

The only other case in which a court has extensively applied the *Burr Road* factors is, of course, the present case. In doing so, the majority first concludes that there is indeed an "explicit, well-defined and dominant public policy against the possession and recreational use of marijuana in the workplace." See *Enfield* v. *AFSCME, Council 4, Local 1029*, 100 Conn. App. 470, 476, 918 A.2d 934, cert. denied, 282 Conn. 924, 925 A.2d 1105 (2007).

Under the first factor, the majority concludes that because the state's personnel regulations allow for discipline, up to and including termination, in regard to the grievant's offense of smoking and possessing marijuana at work, that public policy would not be offended by the imposition of a penalty of less than termination. Under the second factor, whether the nature of the employment implicates public trust and safety, the majority concludes that the factor weighs against vacat-

ing the arbitration award. The grievant is a state employee who works as a skilled maintainer at the University of Connecticut Health Center (health center), a state-run medical facility, performing buildings and equipment maintenance, grounds work, and skilled trades tasks. In his position, the grievant had keys and access to the entirety of the health center campus as well as a state vehicle in order to traverse the property. The majority concludes, however, that the grievant's position is "not the kind of general public oriented, 'safety sensitive' [position] typically associated with a public policy mandate that absolutely bars reinstatement following an instance of drug use."

In its treatment of the third factor, the relative egregiousness of the misconduct, the majority determines that the factor "essentially is neutral," despite its recognition that "the misconduct at issue was completely unacceptable . . . ." Although the majority notes that the grievant's acts were significant and fell squarely within the public policy against drug use in the workplace, it also recognizes that the grievant's actions did not result in any actual harm to other persons or property, and that the arbitrator determined that the grievant had a positive prior work record and that the consequences of the grievant's actions had a "sobering impact" on him. In concluding that the third factor is neutral in the present case, the majority relies in part on several federal arbitration cases that resulted in a grievant's reinstatement being upheld even though the drug related conduct in those cases was more egregious that the grievant's actions in the present case. Under the fourth factor, the majority simply defers, as *Burr Road* mandates, to the arbitrator's finding that the grievant deserved a second chance and that his penalty, including an unpaid suspension, was sufficient to deter any future temptation to use illicit drugs in the workplace.

Prior to articulating the ways in which I believe this court should modify its decision in *Burr Road*, I acknowledge from the outset that because "we favor arbitration as a means of settling private disputes, we undertake judicial review of arbitration awards in a manner designed to minimize interference with an efficient and economical system of alternative dispute resolution." (Internal quotation marks omitted.) *State* v. *AFSCME, Council 4, Local 391*, supra, 309 Conn. 526; see also *State* v. *AFSCME, Council 4, Local 387, AFL-CIO*, supra, 252 Conn. 473 ("[w]e have consistently stated that arbitration is the favored means of settling differences and arbitration awards are generally upheld" [internal quotation marks omitted]). As arbitration awards that are challenged as violative of a public policy are one of the few areas in which a reviewing court will eschew its profound deference to an arbitrator's decision and conduct a more meaningful review, I propose modifying *Burr Road* not to disturb the tradi-

tional deference we afford to arbitration awards, but to ensure that the difference between the deference we grant to arbitration awards generally and the deference that we apply in reviewing awards that implicate public policy is not blurred to the point of nonexistence.

In my review of the cases applying the *Burr Road* factors, I have identified two emerging trends that I believe should be addressed and rectified before they can continue to grow and inject confusion and error into the application of the factors by reviewing courts. First, I believe that, because the factors set forth in *Burr Road* are ultimately too rigid, arbitrators will craft their awards pursuant to *Burr Road* in a manner to ensure that, under the applicable standard of review, reviewing courts will have no option but to uphold the awards even in extreme and outrageous cases, such as the present one. This will allow arbitrators to self-insulate their awards from meaningful review in order to ensure that their awards are sustained on appeal. Second, given the broad and numerous subfactors in the third *Burr Road* factor, the net outcome under the third factor will almost always be neutral, as in the present case, unless the facts of the case indicate an extreme level of egregiousness. The near mathematical process of balancing the outcomes of the various sub-factors, either in favor of vacating or confirming an award, increases the probability of their canceling each other out and producing an indeterminate outcome under the third factor itself. This has the net outcome of reducing the overall flexibility of our analysis. Furthermore, I believe that some of the subfactors under the third factor should be more fully fleshed out and prominent in a reviewing court's analysis, as they were in some of our decisions prior to *Burr Road*.

In regard to the first trend I have identified, stemming from the rigidity of the *Burr Road* factors, I observe that one of the benefits of our decision in *Burr Road* is that it clearly laid out the information that would be helpful to aid reviewing courts in their analysis as to whether a particular award violates public policy. The danger, however, is that by imposing a rigid framework under which we will review such claims, arbitrators now have a set of blueprints by which they may construct their arbitration awards to ensure that they will include the features that ensure such awards are upheld on appeal or only undergo cursory review. Indeed, in *Burr Road* we explicitly encouraged such a result, perhaps unintentionally, when we observed that the clarified factors would also serve as a guide for "the types of factual findings an arbitrator may make in order to assist a reviewing court in considering such a challenge." *Burr Road*, supra, 316 Conn. 633. Because we also articulated the appropriate level of deference that a reviewing court should grant to particular findings, arbitrators may now craft their findings in a way to make certain that they have the final say on certain

aspects of an arbitration award. This is most evident under the fourth factor, which asks whether a grievant is incorrigible. We noted that a reviewing court should defer to an arbitrator's "express or implied" finding as to whether a particular grievant is at risk of repeating the offense if reinstated. Id., 640. Although we also outlined the process by which a reviewing court would analyze that factor in the absence of an explicit finding, such a scenario will almost never arise again in the wake of *Burr Road*. Rather, our decision serves as a clarion call for arbitrators to *always* make an explicit finding on recidivism, for if they do, that finding will automatically be deferred to and upheld on appeal.

I note that this risk has not yet fully germinated. Of the judicial decisions applying the *Burr Road* factors, all of them involved review of an arbitration award that was issued *prior* to our decision in *Burr Road*.[2] I believe, however, that going forward, reviewing courts will increasingly encounter arbitration awards issued as a mirror image of the *Burr Road* factors and, accordingly, reviewing courts will be required to defer absolutely to these awards and uphold their validity without conducting any meaningful review. In my opinion, such an outcome empowers arbitrators beyond their traditional role, particularly in cases such as the present where the arbitrator was just one person—not a panel—and our deference to that one person's determinations is greater than that we would accord to a trial court. This outcome effectively eliminates the role of the courts by erasing the distinction between the vast deference we apply to all arbitration awards and the qualified deference we apply when a party claims that an award violates public policy. See *Garrity* v. *McCaskey*, 223 Conn. 1, 6, 612 A.2d 742 (1992); *Groton* v. *United Steelworkers of America*, supra, 254 Conn. 44–45.

In regard to the second trend I have identified—the virtually inevitable result that the third factor will be neutral—I believe that the current subfactors of the third factor of *Burr Road* should be given a more prominent place in the analysis conducted by a reviewing court. When evaluating the relative egregiousness of a grievant's conduct, the third factor currently directs reviewing courts to consider a myriad of subfactors, "including, but not limited to: (1) the severity of the harms imposed and risks created by the grievant's conduct; (2) whether that conduct strikes at the core or falls on the periphery of the relevant public policy; (3) the intent of the grievant with respect to the offending conduct and the public policy at issue; (4) whether reinstating the grievant would send an unacceptable message to the public or to other employees regarding the conduct in question; (5) the potential impact of the grievant's conduct on customers/clients and other nonparties to the employment contract; (6) whether the misconduct occurred during the performance of official duties; and (7) whether the award reinstating the

employee is founded on the arbitrator's determination that mitigating circumstances, or other policy considerations, counterbalance the public policy at issue." *Burr Road,* supra, 316 Conn. 638.

In applying these subfactors in the present case, the majority concludes that the outcome under the third factor is ultimately neutral. Although the facts and arbitration award clearly demonstrate that the grievant purposely brought marijuana to work with the intention of smoking it during his work shift and then proceeded to actually do so, the arbitrator also found that the competing policy goals of progressive discipline and rehabilitation were implicated in the grievant's case and that the reduced penalties imposed on him in his reinstatement pursuant to the award would dissuade the grievant or his colleagues from using drugs in the workplace going forward. Thus, the outcomes under the subfactors of the third factor fall in such vastly different directions that the overall analysis under the third factor is essentially written out of the *Burr Road* analysis.

This result, which I believe will arise in the majority of cases, has the effect of weakening public policy review as a whole. Indeed, only in those cases that fall outside the bounds of even the extreme outer fringe of public policy claims and are plainly outrageous and societally unacceptable will the third factor prove to be of any determinative import. A prime example of this is *Bridgeport Board of Education,* in which the subfactors clearly weighed in favor of vacating the award given the manifest absurdity of reinstating the grievant after he seriously threatened to carry out a mass school shooting. *Bridgeport Board of Education* v. *NAGE, Local RI-200,* supra, 160 Conn. App. 502–503. Otherwise, given the breadth of the inquiry under the third factor, most cases—such as the present—will yield a mixed bag of answers resulting in a neutral and unhelpful result.

In order to give some of the subfactors a more prominent place in our analysis and allow for greater flexibility in the analysis overall given the wide diversity of factual scenarios in the cases in this area of law, I suggest that we should modify *Burr Road* in order to highlight the importance of certain subfactors that would allow the third factor itself to be more determinative. I place particular emphasis on the fourth subfactor, "whether reinstating the grievant would send an unacceptable message to the public or to other employees regarding the conduct in question"; *Burr Road,* supra, 316 Conn. 638; as the public perception of a public policy underlies the strength of the policy itself. For example, in the present case, upholding the arbitration award sends the concurrent message that an employee will retain his job even if he is caught in the deliberate act of using drugs while on the clock. Indeed, the result

in the present case also sends a message to the public at large that will only reinforce the common, albeit unfounded, negative stereotype of state employees as occupying cushy jobs that tolerate workplace conduct that would be fatal in the private sector.[3] This outcome will likely raise the ire of citizens who will perceive their tax money as being used to fund the paychecks of employees who spend their time at work getting high and will decrease public confidence in the professionalism and integrity of state employees. To be sure, it may even have a demoralizing effect on those state employees who conduct themselves responsibly and take pride in their work and who may resent being viewed under a cloud of public opprobrium. And, most unfortunately, it will send a signal to less than scrupulous employees who will perceive that—under the reasoning of today's decision—they can kick back and light up a joint during their down time at work with the knowledge that, if apprehended, they will be subject only to some discipline, albeit harsh, but will not *actually* be fired.

I note that prior to *Burr Road* this subfactor was somewhat more prominent in our treatment of public policy claims. In *AFSCME, Council 4, Local 387, AFL-CIO*, the arbitration award at issue reinstated a state correctional officer who was terminated after he used a workplace telephone to place a racist and profane call to a state senator's office. *State* v. *AFSCME, Council 4, Local 387, AFL-CIO*, supra, 252 Conn. 468–69. In crafting the award, the arbitrator excused the correctional officer's conduct as " 'the outgrowth of various personal stressors . . . .' " Id., 477. The trial court vacated the award and this court upheld that decision, noting that to do otherwise would "send the message that stress, or poor judgment, or other factors, somehow renders the conduct permissible or excusable." (Internal quotation marks omitted.) Id. Likewise, in *United Steelworkers of America*, the plaintiff challenged an arbitration award reinstating a municipal employee who had been fired after he was convicted of embezzling his employer's funds. *Groton* v. *United Steelworkers of America*, supra, 254 Conn. 36. In concluding that the trial court properly vacated the award, this court noted that by doing so "the public who are required to deal with [the town's] employees will feel that they are being served in an honest and trustworthy manner." Id., 49; see also *Bridgeport Board of Education* v. *NAGE, RI-200*, supra, 160 Conn. App. 502 (recognizing that to uphold arbitration award would send message to public and other employees that threat "to commit random shootings in an educational setting is permissible or excusable").

Accordingly, I suggest that the subfactors should be incorporated into our *Burr Road* matrix not as subsets of the third factor, but as factors in their own right. Although this would diminish the neat and contained

quadripartite analysis under the current incarnation of *Burr Road*, I believe that it would allow for a more flexible approach for reviewing courts. Such an approach would prevent our current analysis from growing narrower than it was in our inquiries prior to *Burr Road*. As our decision in *Burr Road* created no new law, but only catalogued and recalibrated our existing jurisprudence in this area, our present authority and the scope of our inquiry should not be significantly different from our previous decisions. First, such an approach would recognize that not every factor will always be relevant in every case, given the sheer diversity of the facts in cases that engender public policy challenges to arbitration awards. Thus, to prevent the possible neutral outcome of a factor from skewing the *Burr Road* analysis one way or the other, drawing out the subfactors will provide for a more holistic approach that fairly weighs all relevant considerations in regard to a particular arbitration award. Furthermore, allowing for a more flexible approach will work to prevent the other emerging trend I have identified where arbitrators will mirror their awards after the structure of *Burr Road* and include all of the necessary sound bites to ensure that their awards are deferred to and upheld on appeal without any serious review by a court. Additionally, our inquiry could be made even more flexible by reserving the ability to place greater emphasis on some subfactors over others depending on which are implicated by the particular facts of a case.

In conclusion, I predict that as future cases arise—particularly those in which courts are required to review arbitration awards issued after *Burr Road*—the need to modify the factors we apply will become increasingly evident. Although a general deference to the determinations of arbitrations facilitates and encourages the private dispute resolution system, curtailing the role of the court system in reviewing one narrow category of arbitration awards that implicate important public policies will sow public skepticism of the arbitration process and the role of the court system in reviewing the outcomes of private dispute resolution. Indeed, the outcome in today's decision will assuredly accomplish just that. This court should take the opportunity to temper these trends now before they become increasingly prominent and require much more serious and laborious modifications in the future. Accordingly, I concur in the judgment.

[1] At least three other cases from this same time period raised public policy claims, but the courts reviewing the arbitration awards in those cases were not required to apply the *Burr Road* factors because they concluded that the public policy at issue was either nonexistent or not implicated by the facts of the case. See *Ippolito* v. *Olympic Construction, LLC*, 163 Conn. App. 440, 451–54, 136 A.3d 653 (2016) (concluding that enforcement of contract against homeowners did not implicate any well-defined state public policy); *Ledyard Police Union, Council 15, AFSCME, AFL-CIO* v. *Ledyard*, Superior Court, judicial district of New London, Docket No. CV-14-6022135-S (October 6, 2015) (concluding that union's alleged public policy could not be explicitly or implicitly inferred from General Statutes); *Garbarino* v. *Raymond James Financial Services, Inc.*, Superior Court, judicial district

of Danbury, Docket No. CV-14-6016430-S (June 29, 2015) (recognizing state's well-defined public policy in favor of protecting statements made in quasi-judicial proceedings but concluding facts did not implicate public policy).

[2] This court released its decision in *Burr Road* on May 5, 2015. The arbitration award in *East Hartford Police Officers' Assn.* was issued on November 10, 2014. *East Hartford* v. *East Hartford Police Officers' Assn.*, supra, 61 Conn. L. Rptr. 863. The arbitration panel in *Bridgeport Board of Education* issued its award on January 9, 2013. *Bridgeport Board of Education* v. *NAGE, Local RI-200*, supra, 160 Conn. App. 487. Naturally, the arbitration award at issue in *Burr Road* preceded the decision in that case and, in the present case, the arbitrator issued his award on January 25, 2014.

[3] Through sheer coincidence, the grievant's case reaches this court at the same time that the state's fiscal situation has required the layoff of numerous state employees. That these employees have lost their positions through no fault of their own while the grievant will retain his position after openly smoking marijuana on the job certainly sends a mixed and troubling message, both to the public and to those employees who were terminated from state service.