ESPINOSA, J., concurring.
 

 In today's decision, this court concludes that an arbitrator's award that effectively precludes an employer from terminating an employee who was abusing drugs on the job does not violate public policy. Because this result is legally required by this court's recent decision in
 
 Burr Road Operating Co. II, LLC v. New England Health Care Employees Union, District 1199,
 

 316 Conn. 618
 
 ,
 
 114 A.3d 144
 
 (2015) (
 
 Burr Road
 
 ), the principle of stare decisis compels me-reluctantly-to concur in the judgment reversing the trial court's denial of the application filed by the named defendant, Connecticut Employees Union Independent, to confirm the arbitrator's award to reinstate the grievant, Gregory Linhoff. I write separately to emphasize that, although
 
 Burr Road
 
 made significant progress in synthesizing and clarifying our jurisprudence in this area of the law, it is my belief that-as the plainly outrageous outcome in the present case demonstrates-we should consider modifying the analysis set forth in
 
 Burr Road
 
 in order to provide for a more flexible approach when reviewing whether an arbitration award contravenes public policy. In particular, I believe that our analysis should afford a more prominent role to the message that
 an
 award sends to the public at large concerning the public policies at issue. As the present case has provided this court with the opportunity to apply the
 
 Burr Road
 
 factors to a new factual scenario, I am now convinced that the net effect of our decision in
 
 Burr Road
 
 is to take the already narrow confines of our review of arbitration awards that are claimed to violate public policy and further narrow it to the point where this court will simply rubber stamp those awards without any meaningful review on our part.
 

 I begin with a review of our decision in
 
 Burr Road
 
 and how we used that decision as a vehicle to clarify our case law in this area. In
 
 Burr Road,
 
 we considered whether an arbitrator's award reducing the penalty received by the grievant, a certified nursing assistant, from termination of employment to a one month unpaid suspension for failing to promptly report suspected patient abuse, violated the state's public policy in favor of protecting vulnerable persons residing in nursing homes. Id., at 620,
 
 114 A.3d 144
 
 . The particulars of the grievant's case in
 
 Burr Road
 
 were less egregious than the facts of the present case. After overhearing a conversation between two coworkers, the grievant became suspicious that a patient may have been physically mistreated by a staff member at the nursing home where the grievant was employed. Id., at 622-23,
 
 114 A.3d 144
 
 . The grievant did not officially report the suspected abuse, however, until several days later when she had the opportunity to speak with the patient who confirmed the grievant's suspicions that a staff member had behaved in a "rough" manner and had spoken "gruffly" while assisting the patient. Id., at 623,
 
 114 A.3d 144
 
 . Following an internal investigation, the grievant was terminated for her failure to timely report the suspected misconduct-a penalty significantly more severe than that received by the employees actually involved in the misconduct. Id., at 624-25,
 
 114 A.3d 144
 
 . The grievant contested her termination and an arbitrator ultimately
 issued an award reinstating the grievant and determining that she had been terminated without just cause. Id., at 627,
 
 114 A.3d 144
 
 .
 

 Prior to addressing the substantive claim in
 
 Burr Road,
 
 however, we took the opportunity to review our prior decisions in which employers had challenged arbitration awards reinstating terminated employees on the basis that the awards violated a clear public policy. Id., at 632,
 
 114 A.3d 144
 
 . Of our previous decisions, we noted that our outcomes were evenly split as to whether the award at issue in the case violated public policy and further observed this was "an area of the law in which consensus has proved elusive" due to the numerous concurring and dissenting opinions filed in those previous decisions. Id., at 632-33,
 
 114 A.3d 144
 
 ; see
 
 Stratford v. AFSCME, Council 15, Local 407,
 

 315 Conn. 49
 
 ,
 
 105 A.3d 148
 
 (2014) ;
 
 State v. AFSCME, Council 4, Local 391,
 

 309 Conn. 519
 
 ,
 
 69 A.3d 927
 
 (2013) ;
 
 State v. New England Health Care Employees Union, District 1199, AFL-CIO,
 

 271 Conn. 127
 
 ,
 
 855 A.2d 964
 
 (2004) ;
 
 South Windsor v. South Windsor Police Union Local 1480, Council 15, AFSCME, AFL-CIO,
 

 255 Conn. 800
 
 ,
 
 770 A.2d 14
 
 (2001) ;
 
 Groton v. United Steelworkers of America,
 

 254 Conn. 35
 
 ,
 
 757 A.2d 501
 
 (2000) ;
 
 State v. AFSCME, Council 4, Local 387, AFL-CIO,
 

 252 Conn. 467
 
 ,
 
 747 A.2d 480
 
 (2000).
 

 In order to quell any uncertainty stemming from these prior decisions, our decision in
 
 Burr Road
 
 set out to "clarify the factors a reviewing court should consider when evaluating a claim that an arbitration award reinstating a terminated employee violates public policy, and, by extension, the types of factual findings an arbitrator may make in order to assist a reviewing court in considering such a challenge."
 

 Burr Road,
 
 supra,
 
 316 Conn. at 633
 
 ,
 
 114 A.3d 144
 
 . We distilled from our prior decisions those factors that we "expressly or implicitly" relied on to determine whether a grievant's termination is necessary to vindicate a particular public policy, namely: "(1) any
 guidance offered by the relevant statutes, regulations, and other embodiments of the public policy at issue; (2) whether the employment at issue implicates public safety or the public trust; (3) the relative egregiousness of the grievant's conduct; and (4) whether the grievant is incorrigible." Id., at 634,
 
 114 A.3d 144
 
 .
 

 As to each factor, we also articulated the applicable standard of review. For the first factor, we recognized that "[w]hether sources of public policy themselves mandate termination is a question of law subject to plenary review." Id., at 635,
 
 114 A.3d 144
 
 ;
 
 State v. AFSCME, Council 4, Local 391,
 
 supra,
 
 309 Conn. at 528-29
 
 ,
 
 69 A.3d 927
 
 . In regard to the second factor, we concluded that because it "hinges on general questions of law and policy" it is "subject to plenary judicial review."
 
 Burr Road,
 
 supra,
 
 316 Conn. at 637
 
 ,
 
 114 A.3d 144
 
 . Under the remaining two factors, however, our review is much more deferential to the arbitrator's findings and determinations. Recognizing that "the factual findings of the arbitrator ... are not subject to judicial review," we clarified that, under the third factor, "[w]e defer ... to the arbitrator's ultimate determination whether termination was a just or appropriate punishment for the conduct at issue." Id., at 638,
 
 114 A.3d 144
 
 . We observed, however, that given the importance of public policy claims, "we review de novo the question whether the remedy fashioned by the arbitrator is sufficient to vindicate the public policies at issue." Id., at 639,
 
 114 A.3d 144
 
 . Finally, in regard to the fourth factor, we acknowledged that we "must defer to an arbitrator's assessment-whether express or implied-that a particular employee is unlikely to reoffend if reinstated." Id., at 640,
 
 114 A.3d 144
 
 .
 

 We next proceeded to resolve the claim raised by the defendant union on the grievant's behalf under the clarified factors. Id., at 640-41,
 
 114 A.3d 144
 
 . After first determining that the first two factors were neutral; id., at 644, 645,
 
 114 A.3d 144
 
 ; we concluded that under the third factor, the grievant's delay in reporting suspected patient abuse was not so
 egregious that public policy required her termination. Id., at 648-49,
 
 114 A.3d 144
 
 . Specifically, we noted that the arbitrator determined that the grievant's conduct-failing to report the suspected abuse through the proper channels-was markedly less egregious than the actions of the other employees involved in the incident, namely, misconduct toward a patient. Id., at 646,
 
 114 A.3d 144
 
 . Relying on and in deference to the arbitrator's factual findings, we concluded that the grievant's conduct "was devoid of insidious motives" and, as in previous cases in which we had upheld such awards, "there was no evidence of intent to harm the [patient], the magnitude of the harm was minimal, and the conduct itself was not criminal in nature." Id., at 646-47,
 
 114 A.3d 144
 
 . We concluded that the finding of the arbitrator that the grievant was unlikely to reoffend resolved the fourth factor. Id., at 649,
 
 114 A.3d 144
 
 . In sum, we concluded that confirmation of the award did not run counter to public policy and we reversed the judgment of the Appellate Court ordering the trial court to grant the application to vacate the award. Id., at 621, 651,
 
 114 A.3d 144
 
 .
 

 In the time that has elapsed between our decision in
 
 Burr Road
 
 and today's decision, courts have applied the analysis and factors that we articulated in
 
 Burr Road
 
 in at least two other cases.
 
 [1]
 
 See
 
 Bridgeport Board
 

 of Education v. NAGE, Local RI-200,
 

 160 Conn.App. 482
 
 ,
 
 125 A.3d 658
 
 (2015) ;
 
 East Hartford v. East Hartford Police Officers' Assn.,
 
 Superior Court, judicial district of Hartford, Docket No. CV-14-6055713-S,
 
 2016 WL 1265957
 
 (March 2, 2016) (
 
 61 Conn. L. Rptr. 863
 
 ). Although I recognize that the four cases in which the
 
 Burr Road
 
 factors have been applied provide only a limited sample size, I observe that in three of those cases-
 
 Burr Road, East Hartford Police Officers' Assn.,
 
 and the present case-the court upheld the contested arbitration award, whereas in only one case-
 
 Bridgeport Board of Education
 
 -did the court vacate an arbitration award. These decisions illustrate that the
 
 Burr Road
 
 factors have produced certain unintended effects and are in need of modification in order to prevent future judicial review of arbitration awards challenged on public policy grounds from becoming a rubber stamp process in which the reviewing court is required to gloss over the arbitration award without conducting any meaningful inquiry. As this court has previously observed, "[e]xperience can and often does demonstrate that a rule, once believed sound, needs modification to serve justice better." (Internal quotation marks omitted.)
 
 Connecticut Junior Republic v. Sharon Hospital,
 

 188 Conn. 1
 
 , 17-18,
 
 448 A.2d 190
 
 (1982) ;
 
 State v. Dabkowski,
 

 199 Conn. 193
 
 , 199,
 
 506 A.2d 118
 
 (1986) ("[t]he flexibility and capacity of the common law is its genius for growth and adaptation").
 

 The arbitration award at issue in
 
 East Hartford Police Officers' Assn.
 
 reinstated a police officer who had been terminated after it was discovered that he had improperly accessed an investigative database in order to obtain personal information about a former girlfriend and other individuals.
 
 East Hartford v. East Hartford Police Officers' Assn.,
 
 supra,
 
 61 Conn. L. Rptr. at 863
 
 . In reviewing the arbitration award, the trial court first recognized that the award did indeed implicate a public
 policy, namely the public trust placed in the police given their ability to access confidential information.
 
 Id., at 864
 
 . After reciting the four factors in
 
 Burr Road,
 
 the trial court concluded that the award implicated public safety and public trust but that the public policy did "not mandate termination."
 
 Id.
 
 The court then concluded that under the third factor, the "offense was egregious," but that the arbitrator did not find the grievant to be incorrigible.
 
 Id.
 
 Accordingly, the trial court denied the plaintiff's motion to vacate the award.
 
 Id.
 

 The second case,
 
 Bridgeport Board of Education,
 
 although far more demonstrative of the application of the
 
 Burr Road
 
 factors, involved such extreme facts that the factors inarguably weighed against the award. The grievant, a custodian employed by the Bridgeport public school system, was terminated after sending several
 packets of handwritten and printed materials related to recent mass school shootings to various members of the Bridgeport city government and school system.
 
 Bridgeport Board of Education v. NAGE, Local RI-200,
 
 supra,
 
 160 Conn.App. at 485
 
 ,
 
 125 A.3d 658
 
 . The handwritten notes from the grievant indicated that he was prepared to carry out a similar atrocity unless his grievances with a supervisor were addressed. Id., at 485-86,
 
 125 A.3d 658
 
 . A panel of arbitrators determined that the grievant's actions were a "cry for help" and issued an award reinstating the grievant. (Internal quotation marks omitted.) Id., at 488,
 
 125 A.3d 658
 
 .
 

 The Appellate Court reversed the trial court's judgment denying the plaintiff's application to vacate the arbitration award. Id., at 505-506,
 
 125 A.3d 658
 
 . The Appellate Court first recognized that the case implicated "well established public policies prohibiting workplace violence, threatening and harassment, and promoting safe settings for Connecticut public schools." Id., at 491,
 
 125 A.3d 658
 
 . Under the first factor, the Appellate Court concluded that "[t]he answer to this question weighs heavily in favor of vacating the arbitration award" given the "intolerable"
 

 nature of the grievant's acts. Id., at 496-97,
 
 125 A.3d 658
 
 . In regard to the second factor, the Appellate Court explicitly disavowed the union's argument that because the grievant was only a custodian his position did not implicate the public trust or safety by concluding that his conduct put students and the public at risk. Id., at 497-98,
 
 125 A.3d 658
 
 . Under the third factor, the Appellate Court disagreed with the arbitration panel's determination that the grievant's conduct was a "cry for help," and noted that excusing the grievant's conduct due to his personal stress would send an unacceptable message that such impermissible conduct would be tolerated if motivated by stress or poor judgment. (Internal quotation marks omitted.) Id., at 502,
 
 125 A.3d 658
 
 . Under the fourth factor, the arbitration panel had concluded that the grievant was not likely to repeat his offensive conduct, but the Appellate Court, however, concluded that there was a high likelihood of recidivism, given that the grievant had been subject to prior discipline in his current position and that any penalty short of termination would not serve to deter future similar conduct. Id., at 505,
 
 125 A.3d 658
 
 . As all of the
 
 Burr Road
 
 factors weighed in favor of vacating the arbitration award, the Appellate Court reversed the judgment of the trial court. Id., at 505-506,
 
 125 A.3d 658
 
 .
 

 The only other case in which a court has extensively applied the
 
 Burr Road
 
 factors is, of course, the present case. In doing so, the majority first concludes that there is indeed an "explicit, well-defined and dominant public policy against the possession and recreational use of marijuana in the workplace." See
 
 Enfield v. AFSCME, Council 4, Local 1029,
 

 100 Conn.App. 470
 
 , 476,
 
 918 A.2d 934
 
 , cert. denied,
 
 282 Conn. 924
 
 ,
 
 925 A.2d 1105
 
 (2007).
 

 Under the first factor, the majority concludes that because the state's personnel regulations allow for discipline, up to and including termination, in regard to the grievant's offense of smoking and possessing marijuana at work, that public policy would not be offended
 by the imposition of a penalty of less than termination. Under the second factor, whether the nature of the employment implicates public trust and safety, the majority concludes that the factor weighs against vacating the arbitration award. The grievant is a state employee who works as a skilled maintainer at the University of Connecticut Health Center (health center), a state-run medical facility, performing buildings and equipment maintenance, grounds work, and skilled trades tasks. In his position, the grievant had keys and access to the entirety
 of the health center campus as well as a state vehicle in order to traverse the property. The majority concludes, however, that the grievant's position is "not the kind of general public oriented, 'safety sensitive' [position] typically associated with a public policy mandate that absolutely bars reinstatement following an instance of drug use."
 

 In its treatment of the third factor, the relative egregiousness of the misconduct, the majority determines that the factor "essentially is neutral," despite its recognition that "the misconduct at issue was completely unacceptable...." Although the majority notes that the grievant's acts were significant and fell squarely within the public policy against drug use in the workplace, it also recognizes that the grievant's actions did not result in any actual harm to other persons or property, and that the arbitrator determined that the grievant had a positive prior work record and that the consequences of the grievant's actions had a "sobering impact" on him. In concluding that the third factor is neutral in the present case, the majority relies in part on several federal arbitration cases that resulted in a grievant's reinstatement being upheld even though the drug related conduct in those cases was more egregious that the grievant's actions in the present case. Under the fourth factor, the majority simply defers, as
 
 Burr Road
 
 mandates, to the arbitrator's finding that the grievant
 deserved a second chance and that his penalty, including an unpaid suspension, was sufficient to deter any future temptation to use illicit drugs in the workplace.
 

 Prior to articulating the ways in which I believe this court should modify its decision in
 
 Burr Road,
 
 I acknowledge from the outset that because "we favor arbitration as a means of settling private disputes, we undertake judicial review of arbitration awards in a manner designed to minimize interference with an efficient and economical system of alternative dispute resolution." (Internal quotation marks omitted.)
 
 State v. AFSCME, Council 4, Local 391,
 
 supra,
 
 309 Conn. at 526
 
 ,
 
 69 A.3d 927
 
 ; see also
 
 State v. AFSCME, Council 4, Local 387, AFL-CIO,
 
 supra, 252 Conn. at 473,
 
 747 A.2d 480
 
 ("[w]e have consistently stated that arbitration is the favored means of settling differences and arbitration awards are generally upheld" [internal quotation marks omitted] ). As arbitration awards that are challenged as violative of a public policy are one of the few areas in which a reviewing court will eschew its profound deference to an arbitrator's decision and conduct a more meaningful review, I propose modifying
 
 Burr Road
 
 not to disturb the traditional deference we afford to arbitration awards, but to ensure that the difference between the deference we grant to arbitration awards generally and the deference that we apply in reviewing awards that implicate public policy is not blurred to the point of nonexistence.
 

 In my review of the cases applying the
 
 Burr Road
 
 factors, I have identified two emerging trends that I believe should be addressed and rectified before they can continue to grow and inject confusion and error into the application of the factors by reviewing courts. First, I believe that, because the factors set forth in
 
 Burr Road
 
 are ultimately too rigid, arbitrators will craft their awards pursuant to
 
 Burr Road
 
 in a manner to ensure that, under the applicable standard of review,
 reviewing courts will have no option but to uphold the awards even in extreme and outrageous cases, such as the present one. This will allow arbitrators to self-insulate their awards from meaningful review in order to ensure that their awards are sustained on appeal. Second, given the broad and numerous subfactors in the third
 
 Burr Road
 
 factor, the net outcome under the third
 factor will almost always be neutral, as in the present case, unless the facts of the case indicate an extreme level of egregiousness. The near mathematical process of balancing the outcomes of the various sub-factors, either in favor of vacating or confirming an award, increases the probability of their canceling each other out and producing an indeterminate outcome under the third factor itself. This has the net outcome of reducing the overall flexibility of our analysis. Furthermore, I believe that some of the subfactors under the third factor should be more fully fleshed out and prominent in a reviewing court's analysis, as they were in some of our decisions prior to
 
 Burr Road.
 

 In regard to the first trend I have identified, stemming from the rigidity of the
 
 Burr Road
 
 factors, I observe that one of the benefits of our decision in
 
 Burr Road
 
 is that it clearly laid out the information that would be helpful to aid reviewing courts in their analysis as to whether a particular award violates public policy. The danger, however, is that by imposing a rigid framework under which we will review such claims, arbitrators now have a set of blueprints by which they may construct their arbitration awards to ensure that they will include the features that ensure such awards are upheld on appeal or only undergo cursory review. Indeed, in
 
 Burr Road
 
 we explicitly encouraged such a result, perhaps unintentionally, when we observed that the clarified factors would also serve as a guide for "the types of factual findings an arbitrator may make in order to assist a reviewing court in considering such a challenge."
 

 Burr Road,
 
 supra,
 
 316 Conn. at 633
 
 ,
 
 114 A.3d 144
 
 . Because we also articulated the appropriate level of deference that a reviewing court should grant to particular findings, arbitrators may now craft their findings in a way to make certain that they have the final say on certain aspects of an arbitration award. This is most evident under the fourth factor, which asks whether a grievant is incorrigible. We noted that a reviewing court should defer to an arbitrator's "express or implied" finding as to whether a particular grievant is at risk of repeating the offense if reinstated. Id., at 640,
 
 114 A.3d 144
 
 . Although we also outlined the process by which a reviewing court would analyze that factor in the absence of an explicit finding, such a scenario will almost never arise again in the wake of
 
 Burr Road.
 
 Rather, our decision serves as a clarion call for arbitrators to
 
 always
 
 make an explicit finding on recidivism, for if they do, that finding will automatically be deferred to and upheld on appeal.
 

 I note that this risk has not yet fully germinated. Of the judicial decisions applying the
 
 Burr Road
 
 factors, all of them involved review of an arbitration award that was issued
 
 prior
 
 to our decision in
 
 Burr Road.
 

 [2]
 
 I believe, however, that going forward, reviewing courts will increasingly encounter arbitration awards issued as a mirror image of the
 
 Burr Road
 
 factors and, accordingly, reviewing courts will be required to defer absolutely to these awards and uphold their validity without conducting any meaningful review. In my opinion, such an outcome empowers arbitrators beyond their traditional role, particularly in cases such as the present
 where the arbitrator was just one person-not a panel-and our deference to that one person's determinations is greater than that we would accord to a trial court. This outcome effectively eliminates the role of the courts by erasing the distinction between the vast deference we apply to all arbitration awards and the qualified deference we apply when a party claims that an award violates public policy. See
 
 Garrity v. McCaskey,
 

 223 Conn. 1
 
 , 6,
 
 612 A.2d 742
 
 (1992) ;
 
 Groton v. United Steelworkers of America,
 
 supra,
 
 254 Conn. at 44-45
 
 ,
 
 757 A.2d 501
 
 .
 

 In regard to the second trend I have identified-the virtually inevitable result that the third factor will be neutral-I believe that the current subfactors of the third factor of
 
 Burr Road
 
 should be given a more prominent place in the analysis conducted by a reviewing court. When evaluating the relative egregiousness of a grievant's conduct, the third factor currently directs reviewing courts to consider a myriad of subfactors, "including, but not limited to: (1) the severity of the harms imposed and risks created by the grievant's conduct; (2) whether that conduct strikes at the core or falls on the periphery of the relevant public policy; (3) the intent of the grievant with respect to the offending conduct and the public policy at issue; (4) whether reinstating the grievant would send an unacceptable message to the public or to other employees regarding the conduct in question; (5) the potential impact of the grievant's conduct on customers/clients and other nonparties to the employment contract; (6) whether the misconduct occurred during the performance of official duties; and (7) whether the award reinstating the employee is founded on the arbitrator's determination that mitigating circumstances, or other policy considerations, counterbalance the public policy at issue."
 
 Burr Road,
 
 supra,
 
 316 Conn. at 638
 
 ,
 
 114 A.3d 144
 
 .
 

 In applying these subfactors in the present case, the majority concludes that the outcome under the third
 factor is ultimately neutral. Although the facts and arbitration award clearly demonstrate that the grievant purposely brought marijuana to work with the intention of smoking it during his work shift and then proceeded to actually do so, the arbitrator also found that the competing policy goals of progressive discipline and rehabilitation were implicated in the grievant's case and that the reduced penalties imposed on him in his reinstatement pursuant to the award would dissuade the grievant or his colleagues from using drugs in the workplace going forward. Thus, the outcomes under the subfactors of the third factor fall in such vastly different directions that the overall analysis under the third factor is essentially written out of the
 
 Burr Road
 
 analysis.
 

 This result, which I believe will arise in the majority of cases, has the effect of weakening public policy review as a whole. Indeed, only in those cases that fall outside the bounds of even the extreme outer fringe of public policy claims and are plainly outrageous and societally unacceptable will the third factor prove to be of any determinative import. A prime example of this is
 
 Bridgeport Board of Education,
 
 in which the subfactors clearly weighed in favor of vacating the award given the manifest absurdity of reinstating the grievant after he seriously threatened to carry out a mass school shooting.
 
 Bridgeport Board of Education v. NAGE, Local RI-200,
 
 supra,
 
 160 Conn.App. at 502-503
 
 ,
 
 125 A.3d 658
 
 . Otherwise, given the breadth of the inquiry under the third factor, most cases-such as the present-will yield a mixed bag of answers resulting in a neutral and unhelpful result.
 

 In order to give some of the subfactors a more prominent place in our analysis and allow for greater flexibility in the analysis
 overall given the wide diversity of factual scenarios in the cases in this area of law, I suggest that we should modify
 
 Burr Road
 
 in order to
 highlight the importance of certain subfactors that would allow the third factor itself to be more determinative. I place particular emphasis on the fourth subfactor, "whether reinstating the grievant would send an unacceptable message to the public or to other employees regarding the conduct in question";
 
 Burr Road,
 
 supra,
 
 316 Conn. at 638
 
 ,
 
 114 A.3d 144
 
 ; as the public perception of a public policy underlies the strength of the policy itself. For example, in the present case, upholding the arbitration award sends the concurrent message that an employee will retain his job even if he is caught in the deliberate act of using drugs while on the clock. Indeed, the result in the present case also sends a message to the public at large that will only reinforce the common, albeit unfounded, negative stereotype of state employees as occupying cushy jobs that tolerate workplace conduct that would be fatal in the private sector.
 
 [3]
 
 This outcome will likely raise the ire of citizens who will perceive their tax money as being used to fund the paychecks of employees who spend their time at work getting high and will decrease public confidence in the professionalism and integrity of state employees. To be sure, it may even have a demoralizing effect on those state employees who conduct themselves responsibly and take pride in their work and who may resent being viewed under a cloud of public opprobrium. And, most unfortunately, it will send a signal to less than scrupulous employees who will perceive that-under the reasoning of today's decision-they can kick back and light up a joint during their down time at work with the knowledge that, if apprehended, they will be subject
 only to some discipline, albeit harsh, but will not
 
 actually
 
 be fired.
 

 I note that prior to
 
 Burr Road
 
 this subfactor was somewhat more prominent in our treatment of public policy claims. In
 
 AFSCME, Council 4, Local 387, AFL-CIO,
 
 the arbitration award at issue reinstated a state correctional officer who was terminated after he used a workplace telephone to place a racist and profane call to a state senator's office.
 
 State v. AFSCME, Council 4, Local 387, AFL-CIO,
 
 supra, 252 Conn. at 468-69,
 
 747 A.2d 480
 
 . In crafting the award, the arbitrator excused the correctional officer's conduct as " 'the outgrowth of various personal stressors....' " Id., at 477,
 
 747 A.2d 480
 
 . The trial court vacated the award and this court upheld that decision, noting that to do otherwise would "send the message that stress, or poor judgment, or other factors, somehow renders the conduct permissible or excusable." (Internal quotation marks omitted.)
 
 Id.
 
 Likewise, in
 
 United Steelworkers of America,
 
 the plaintiff challenged an arbitration award reinstating a municipal employee who had been fired after he was convicted of embezzling his employer's funds.
 
 Groton v. United Steelworkers of America,
 
 supra,
 
 254 Conn. at 36
 
 ,
 
 757 A.2d 501
 
 . In concluding that the trial court properly vacated the award, this court noted that by doing so "the public who are required to deal with [the town's] employees will feel that they are being served in an honest and trustworthy manner." Id., at 49,
 
 757 A.2d 501
 
 ; see also
 
 Bridgeport Board of Education v. NAGE, RI-200,
 
 supra,
 
 160 Conn.App. at 502
 
 ,
 
 125 A.3d 658
 
 (recognizing that
 to uphold arbitration award would send message to public and other employees that threat "to commit random shootings in an educational setting is permissible or excusable").
 

 Accordingly, I suggest that the subfactors should be incorporated into our
 
 Burr Road
 
 matrix not as subsets of the third factor, but as factors in their own right. Although this would diminish the neat and contained
 quadripartite analysis under the current incarnation of
 
 Burr Road,
 
 I believe that it would allow for a more flexible approach for reviewing courts. Such an approach would prevent our current analysis from growing narrower than it was in our inquiries prior to
 
 Burr Road.
 
 As our decision in
 
 Burr Road
 
 created no new law, but only catalogued and recalibrated our existing jurisprudence in this area, our present authority and the scope of our inquiry should not be significantly different from our previous decisions. First, such an approach would recognize that not every factor will always be relevant in every case, given the sheer diversity of the facts in cases that engender public policy challenges to arbitration awards. Thus, to prevent the possible neutral outcome of a factor from skewing the
 
 Burr Road
 
 analysis one way or the other, drawing out the subfactors will provide for a more holistic approach that fairly weighs all relevant considerations in regard to a particular arbitration award. Furthermore, allowing for a more flexible approach will work to prevent the other emerging trend I have identified where arbitrators will mirror their awards after the structure of
 
 Burr Road
 
 and include all of the necessary sound bites to ensure that their awards are deferred to and upheld on appeal without any serious review by a court. Additionally, our inquiry could be made even more flexible by reserving the ability to place greater emphasis on some subfactors over others depending on which are implicated by the particular facts of a case.
 

 In conclusion, I predict that as future cases arise-particularly those in which courts are required to review arbitration awards issued after
 
 Burr Road
 
 -the need to modify the factors we apply will become increasingly evident. Although a general deference to the determinations of arbitrations facilitates and encourages the private dispute resolution system, curtailing the role of the court system in reviewing one narrow category of
 arbitration awards that implicate important public policies will sow public skepticism of the arbitration process and the role of the court system in reviewing the outcomes of private dispute resolution. Indeed, the outcome in today's decision will assuredly accomplish just that. This court should take the opportunity to temper these trends now before they become increasingly prominent and require much more serious and laborious modifications in the future. Accordingly, I concur in the judgment.
 

 At least three other cases from this same time period raised public policy claims, but the courts reviewing the arbitration awards in those cases were not required to apply the
 
 Burr Road
 
 factors because they concluded that the public policy at issue was either nonexistent or not implicated by the facts of the case. See
 
 Ippolito v. Olympic Construction, LLC,
 

 163 Conn.App. 440
 
 , 451-54,
 
 136 A.3d 653
 
 (2016) (concluding that enforcement of contract against homeowners did not implicate any well-defined state public policy);
 
 Ledyard Police Union, Council 15, AFSCME, AFL-CIO v. Ledyard,
 
 Superior Court, judicial district of New London, Docket No. CV-14-6022135S,
 
 2015 WL 6557896
 
 (October 6, 2015) (concluding that union's alleged public policy could not be explicitly or implicitly inferred from General Statutes);
 
 Garbarino v. Raymond James Financial Services, Inc.,
 
 Superior Court, judicial district of Danbury, Docket No. CV-14-6016430-S,
 
 2015 WL 4726738
 
 (June 29, 2015) (recognizing state's well-defined public policy in favor of protecting statements made in quasi-judicial proceedings but concluding facts did not implicate public policy).
 

 This court released its decision in
 
 Burr Road
 
 on May 5, 2015. The arbitration award in
 
 East Hartford Police Officers' Assn.
 
 was issued on November 10, 2014.
 
 East Hartford v. East Hartford Police Officers' Assn.,
 
 supra,
 
 61 Conn. L. Rptr. at 863
 
 . The arbitration panel in
 
 Bridgeport Board of Education
 
 issued its award on January 9, 2013.
 
 Bridgeport Board of Education v. NAGE, Local RI-200,
 
 supra,
 
 160 Conn.App. at 487
 
 ,
 
 125 A.3d 658
 
 . Naturally, the arbitration award at issue in
 
 Burr Road
 
 preceded the decision in that case and, in the present case, the arbitrator issued his award on January 25, 2014.
 

 Through sheer coincidence, the grievant's case reaches this court at the same time that the state's fiscal situation has required the layoff of numerous state employees. That these employees have lost their positions through no fault of their own while the grievant will retain his position after openly smoking marijuana on the job certainly sends a mixed and troubling message, both to the public and to those employees who were terminated from state service.